2003 UT App 152

**Huey L. DEPEW, Plaintiff and Appellant,**

v.

**Denton C. SULLIVAN, Defendant and Appellee.**

No. 20010242–CA.

Court of Appeals of Utah.

May 22, 2003.

Aaron J. Prisbrey, St. George, for Appellant.

Paul H. Matthews, Paul H. Matthews & Associates, PC, Salt Lake City, for Appellee.

Before BILLINGS, Associate Presiding Judge, and GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

¶ 1 Plaintiff Huey Depew sued defendant Denton Sullivan to recover for injuries he sustained when their vehicles collided in a traffic accident. The jury returned a verdict for Defendant, and Plaintiff appealed. Because we hold that the trial court erred in restricting the scope of voir dire during jury selection because of religious considerations, we reverse and remand for a new trial.

## I. BACKGROUND

¶ 2 Plaintiff and Defendant were involved in an accident in Washington County. Plaintiff was driving his motorcycle down a slightly sloped street when Defendant, not seeing Plaintiff, turned his truck left in front of Plaintiff. Plaintiff hit his brakes and skidded approximately forty-one feet. He then jumped off his motorcycle, which was still moving, and landed about twenty feet in front of Defendant's truck. The motorcycle continued to slide on its side and collided with the truck near the truck's rear tire. The motorcycle then slid an additional forty-eight feet. Plaintiff injured his arm as a result of the accident, and he sued Defendant to recover for his injuries and lost wages.

¶ 3 At one point during discovery, Defendant requested from Plaintiff medical bills, tax returns, and other documents and information. Ten months later, having not received some of the documents and information, Defendant filed a motion to compel discovery, which the trial court eventually granted. When Plaintiff still failed to produce the documents, the court awarded sanctions to Defendant, ordering Plaintiff and his counsel to pay Defendant the attorney fees incurred in bringing the motion.

¶ 4 Meanwhile, Defendant departed the state to serve a two-year term as a missionary for the Church of Jesus Christ of Latter-day Saints (the Church) in Pennsylvania. Consequently, Defendant was absent from trial. However, the attorneys deposed him prior to his departure, and Defendant's attorney submitted into evidence a videotaped copy of the deposition.

¶ 5 During jury selection proceedings, Plaintiff's attorney informed the judge: "[O]ne of the issues has to do with the fact [Defendant] is on an LDS mission [i.e., a mission for the Church] and I wanted to ask the jury some questions as to whether they do have children on missions." Categorizing this proposed question as one about religious affiliation, the judge denied the request, stating that "religious affiliation has nothing to do with jury service." The judge put to the venire panel the following substitute question: "Would the fact that ... the defendant[ ] is on a religious mission at the present time give you any problem in applying the facts in the law as you find it from the evidence in this case?" When all of the prospective jurors answered in the negative, the judge moved on to the next question.

¶ 6 During trial, Defendant proposed to call Officer Stacy Richan to testify as an expert witness regarding Plaintiff's precollision speed. Officer Richan was the police officer who had investigated the collision on the day it occurred, at which time he measured Plaintiff's motorcycle skid mark to be forty-one feet long. He had extensive training and experience in accident reconstruction, and although he had not been trained in *motorcycle* accident reconstruction at the time of the collision, he had since received some training in that area. He was prepared to testify that based on the length of the skid mark, Plaintiff must have been traveling between the speeds of 40.93 mph and 46.08 mph just prior to the collision.[1] Plaintiff objected to the testimony, arguing that Officer Richan's calculation was based upon the unverifiable assumption that both motorcycle wheels—and not just one wheel—had skidded the entire forty-one feet. The trial court overruled Plaintiff's objection and allowed Officer Richan to testify.

¶ 7 At the conclusion of trial, Plaintiff moved for a directed verdict against Defendant on the issue of negligence, which the trial court denied. The jury deliberated and then returned a verdict in favor of Defendant,[2] placing one hundred percent of the fault for the collision on Plaintiff and no fault on Defendant. The trial court entered judgment in Defendant's favor and ordered Plaintiff to reimburse Defendant "all taxable costs pursuant to Rule 54[ (d)] of the Utah Rules of Civil Procedure." Defendant subsequently submitted a memorandum of costs, which stated that his total costs—all related to depositions used at trial—amounted to $3,085.05. The trial court ordered Plaintiff to pay that amount to Defendant.

¶ 8 Plaintiff moved for a new trial on the ground that "[t]here is clearly insufficient evidence to justify the verdict and finding of no fault on the part of [Defendant]." The trial court denied the motion.

¶ 9 Plaintiff now appeals and claims that the trial court erred when it imposed discovery sanctions against Plaintiff's counsel, denied Plaintiff's request at voir dire to ask prospective jurors questions about their close familial associations with missionaries, allowed Officer Richan to testify at trial as an expert witness, awarded Defendant costs for depositions, and refused either to direct a verdict against Defendant or to grant a new trial. We reverse the judgment against Plaintiff and remand for a new trial.

## II. VOIR DIRE

### A. Standard of Review and General Principles Regarding Voir Dire

¶ 10 "We review challenges to the trial court's management of jury voir dire

---

1. The posted speed limit at the location of the collision was 25 miles per hour. Plaintiff concedes that he may have been traveling as fast as 30 to 35 miles per hour.

2. The eight-person jury voted seven-to-one in Defendant's favor. Plaintiff would have needed to receive at least six of the eight votes to prevail. *See* Utah Code Ann. § 78–46–5(3)(b) (2002) ("The verdict in a civil case shall be by not less than three-fourths of the jurors.").

under an abuse of discretion standard. Generally, the trial court is afforded broad discretion in conducting voir dire, 'but that discretion must be exercised in favor of allowing discovery of biases or prejudice in prospective jurors.'" *Barrett v. Peterson,* 868 P.2d 96, 98 (Utah Ct.App.1993) (quoting *State v. Hall,* 797 P.2d 470, 472 (Utah Ct.App.), *cert. denied,* 804 P.2d 1232 (Utah 1990))˙ (other citations omitted).

 ¶ 11 Due to the strong interest in enabling parties "to elicit necessary information for ferreting out bias," *State v. Saunders,* 1999 UT 59,¶ 34, 992 P.2d 951,[3] a trial court's

> discretion is most broad when it is exercised with respect to questions that have no apparent link to any potential bias. However, the trial judge's discretion narrows to the extent that questions do have some possible link to possible bias, and when proposed voir dire questions go directly to the existence of an actual bias, that discretion disappears. The trial court must allow such inquiries.

*Id.* at ¶ 43.

 ¶ 12 The Utah Supreme Court has instructed "trial judges to take care to adequately and completely probe jurors on all possible issues of bias." *State v. James,* 819 P.2d 781, 798 (Utah 1991). The purpose for this probing is to facilitate "both the detection of actual bias and the collection of data to permit informed exercise of the peremptory challenge." *State v. Taylor,* 664 P.2d 439, 447 (Utah 1983) (citations omitted). "All that is necessary for a voir dire question to be appropriate is that it allow '[a party] to exercise his peremptory challenges more intelligently.'" *State v. Worthen,* 765 P.2d 839, 845 (Utah 1988) (quoting *State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984)). *Accord Saunders,* 1999 UT 59 at ¶ 34, 992 P.2d 951.

## B. Voir Dire Inquiry Regarding Religion

 ¶ 13 Despite the rather broad permissible scope of voir dire inquiry, limitations exist. The Utah Constitution provides that no person "shall ... be incompetent as a ... juror on account of religious belief or the absence thereof." Utah Const. art. I, § 4. *See* Utah Code Ann. § 78–46–3 (2002) ("A citizen shall not be excluded or exempt from jury service on account of ... religion[.]"). Accordingly, absent the possibility of actual bias stemming from religious beliefs, it is ordinarily inappropriate to inquire into venire members' religious beliefs during voir dire. *See Hornsby v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints,* 758 P.2d 929, 933 n. 2 (Utah Ct.App.) (stating that "[t]he religious beliefs of the prospective jurors are not directly related to the subject matter of this suit, and hence could not properly be examined during voir dire"), *cert. denied,* 773 P.2d 45 (Utah 1988). *See also Yarborough v. United States,* 230 F.2d 56, 63 (4th Cir.) (holding that trial court properly refused to ask questions about religious affiliation when "[n]o matter of any religious significance whatever was involved in the case" and there was "nothing to show that [the appellant] belonged to any religious sect"), *cert. denied,* 351 U.S. 969, 76 S.Ct. 1034, 100 L.Ed. 1487 (1956); *United States v. Daily,* 139 F.2d 7, 9 (7th Cir.1943) ("We agree with the trial court that the defendant's religion and whether or not he was a minister regularly ordained by his creed or sect were not a matter that was in issue before the court, and it was not proper to inquire of the venire about its views as to an issue that was foreign to the issues for trial."). *Cf. State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984) (approving a question about religious beliefs because such beliefs were related to the case but prohibiting attorneys at voir dire from "conduct[ing] an inquisition into the private beliefs and experiences of a venireman").

---

**3.** Although the lead opinion in *State v. Saunders,* 1999 UT 59, 992 P.2d 951, is a plurality opinion, a reading of all of the justices' opinions in that case reveals that we cite herein only to portions of the lead opinion that enjoyed majority support. Similarly, the text we cite from two other Utah Supreme Court cases—*State v. James,* 819 P.2d 781 (Utah 1991), and *State v. Worthen,* 765 P.2d 839 (Utah 1988)—also comes solely from sections of the lead opinions in those cases that received majority support.

### 1. Plaintiff's Proposed Question Was Not About Religion

¶ 14 The central issue in this case is whether Plaintiff's proposed question falls within the purview of the constitutional restrictions on voir dire inquiries regarding religion. We hold that it does not because it was not a question about the venire members' religious affiliations or beliefs.

¶ 15 Plaintiff's counsel proposed to ask merely "whether [the prospective jurors] do have children on missions."[4] Whether intentionally or by sheer luck, Plaintiff's counsel worded his proposed question in a religiously- and denominationally-neutral fashion. An affirmative response to Plaintiff's proposed question would not have revealed the venire members' religious affiliations, for two reasons. First, the fact that a venire member has a child on a mission does not establish that the venire member belongs to any religion, much less the same religion as his or her adult child.[5] Second, as the proposed question did not single out missions for any particular religion—it referred simply to "missions"—venire members could have responded in the affirmative if they had children serving a mission for any religious denomination or, for that matter, any organization whose members serve "missions."[6] Therefore, Plaintiff's proposed question was not, on its face, directed at religious beliefs or affiliation.

¶ 16 "It requires little imagination to understand why [Plaintiff] may have wanted to know" the information his proposed question would have elicited. *Ball*, 685 P.2d at 1060. Plaintiff's question was not concerned with the venire members' religious beliefs. In Plaintiff's own words, Plaintiff's very understandable and believable objective in seeking to ask his question was to "determin[e] which prospective jurors, as a result of their association or experience, might tend to relate to or sympathize with the defendant."

¶ 17 It is generally permissible to inquire at voir dire into venire members' associations with people who are of the same profession as someone connected to the case, and that is all that Plaintiff sought to do here. For example, any parent whose child served as a military officer likely would feel a strong emotional attachment to the military and might very well assign some undue credibility to anyone involved in it. In such a case, voir dire inquiries about military experience would unquestionably be permissible.

---

4. Defendant claims that Plaintiff did not preserve for appeal any questions beyond this very narrow and specific question. He argues that Plaintiff's brief incorrectly claims that Plaintiff preserved for appeal the additional questions of what "affiliation [the prospective jurors] may have with LDS missionaries" and "whether any potential jurors had served an LDS mission." Because we hold that disallowance of the narrow question that Plaintiff actually requested is sufficient to merit a new trial, we need not address the issue of whether Plaintiff implicitly preserved the propriety of related additional questions for appeal.

5. We do realize that a high percentage of Washington County residents are members of the Church and that that church makes missionary work a matter of particular emphasis. Therefore, it is possible, in that county, that declaring one has a child on a mission is akin to disclosing one's religious affiliation or at least might be perceived as such. However, "[a]ny harmless disturbance of a juror's privacy that may occur through the revelation of such general information is outweighed by its close relevance to the possibility of bias in the context of a trial" from which one of the parties is absent due to a decision to work as a missionary. *State v. Ball*, 685 P.2d 1055, 1060 (Utah 1984).

6. In the context of the voir dire and in the community where the trial took place, many venire members might have presumed that "mission" meant "mission for the Church of Jesus Christ of Latter-day Saints." However, the question did not explicitly limit itself to such missions, and venire members should have responded in the affirmative if they had, for example, a son who was a Baptist minister proselytizing in a foreign land or a daughter who was serving as a medical missionary. Indeed, any parent in that situation would probably not presume that the question was limited to missions for the Church, nor would such parents think twice about raising their hands and declaring that they have a child on a mission—and rightly so. Webster's Dictionary defines "mission" not as a two-year endeavor to promote the teachings of the Church but, rather, as "a ministry (as preaching or educational or medical work) commissioned by a church or some other religious organization for the purpose of propagating its faith or carrying on humanitarian work." Webster's Third New International Dictionary 1445 (Philip Babcock Gove ed., 1993).

*Cf. Darbin v. Nourse,* 664 F.2d 1109, 1115 (9th Cir.1981) ("The existence of family relationships between prospective jurors and law enforcement officers was sufficient in itself to require that those jurors be questioned regarding the weight they would give the testimony of law enforcement officers."); *Ball v. Rolling Hill Hosp.,* 359 Pa.Super. 286, 518 A.2d 1238, 1245 (1986) (opinion of Wieand, J.) (concluding trial court did not abuse its discretion in permitting a question about "whether [the prospective jurors] or any of their immediate relatives had ever been employed by ... a casualty insurance company").[7] The fact that Defendant's endeavor happened to be related to religious service is an immaterial distinction in this context. Plaintiff's proposed question focused on nothing more than the simple fact of working as a missionary, and he was entitled to know which prospective jurors had children who were pursuing such an endeavor.

¶ 18 As mentioned above, the Utah Supreme Court has recognized that a "trial judge's discretion narrows to the extent that questions do have some possible link to possible bias, and when proposed voir dire questions go directly to the existence of an actual bias, that discretion disappears." *State v.*

*Saunders,* 1999 UT 59, ¶ 43, 992 P.2d 951. As Plaintiff's proposed question at least had a "possible link to possible [juror] bias,"[8] the trial court's discretion to deny the question was "narrow[ed]." *Id.* We hold that the court exceeded that discretion in refusing to propound the proposed question.

### 2. Religious Inquiry at Voir Dire Is Sometimes Permissible

██ ¶ 19 Even if Plaintiff's proposed question is more properly regarded as one bearing on religion, *see* note 5, we conclude it would be permissible. The Utah Supreme Court has held that in certain situations it is permissible to inquire into religion at voir dire.

¶ 20 In *State v. Ball,* 685 P.2d 1055 (Utah 1984), the defendant appealed his jury conviction on a charge of driving under the influence of alcohol. At voir dire, he sought to ask those members of the venire panel who did not drink if their decision not to drink was "for a personal conviction or a religious one." *Id.* at 1056. The trial judge did not allow the question because he felt it was "precluded by the State Constitution." *Id.* On appeal, the Utah Supreme Court va-

---

7. Maryland's highest court rejected this notion in *Davis v. State,* 333 Md. 27, 633 A.2d 867 (1993). In that case, it was known at the time of voir dire that a police officer was going to testify at trial. For that reason, one of the parties sought to discover "whether anyone on the jury has been a member or is a member of the law enforcement community or whether they have a close relative or friend who is such a member." *Id.* at 870. The trial court rejected this request, and the Court of Appeals of Maryland held that the trial court did not abuse its discretion in doing so. It recognized that "[t]he fact that a prospective juror is employed as, related to, or associated with a law enforcement officer does not establish that the prospective juror has any undue bias or prejudice that will prevent that person from fairly and impartially determining the matter before them." *Id.* at 872.

However, Maryland law regarding the scope of voir dire differs from that of Utah. While the standard for voir dire inquiries in Maryland is whether the inquiry could elicit grounds for a challenge for cause, *see id.,* the standard in Utah is whether it would enable a party " 'to exercise his *peremptory challenges* more intelligently.' " *State v. Worthen,* 765 P.2d 839, 845 (Utah 1988) (quoting *Ball,* 685 P.2d at 1060) (emphasis added).

The Maryland court explicitly recognized that it differed in this regard from some other jurisdictions. It stated that "some other states ... permit parties to use *voir dire* as a means to more effectively exercise peremptory challenges—a practice that this Court has long since rejected." *Davis,* 633 A.2d at 873. *See also State v. Thomas,* 369 Md. 202, 798 A.2d 566, 575 (2002) (Raker, J., concurring) ("Maryland is one of the few states in the country that does not permit voir dire to inform the exercise of peremptory challenges. It has long been the rule in Maryland that voir dire is limited to the detection of bias sufficient to challenge a prospective juror for cause and not to assist in the exercise of peremptory challenges.... [L]et us, once and for all, join the rest of the country and expand the purpose of voir dire in Maryland to include the informed exercise of peremptory challenges.").

8. In framing our analysis this way, we recognize the possibility that Plaintiff's proposed question went "directly to the existence of an actual bias" in the prospective jurors. *Saunders,* 1999 UT 59 at ¶ 43, 992 P.2d 951. However, as its disallowance was improper even under the narrowed discretion standard, we need not definitively address this issue.

cated the defendant's conviction. In doing so, the Court recognized that although one's religion, age, or gender cannot be grounds for juror disqualification, *see* Utah Code Ann. § 78–46–3 (2002), "an exploration of the attitudes and convictions that may exist in a person who belongs to those groups is certainly permissible to aid in discovering actual bias or prejudice relating to the subject matter of a particular case."[9] *Ball,* 685 P.2d at 1057. Since the prospective jurors in *Ball* might have been biased for religious reasons against alcohol consumption and the defendant's charge was related to alcohol consumption, the Court held that "the failure of the [trial] court to permit counsel's inquiry was ... error." *Id.* at 1060.

¶ 21 The Utah Supreme Court is not alone in its willingness to probe into religious preferences during voir dire for cases in which religion might be a source of actual bias. For example, the United States Supreme Court once observed:

> The argument is advanced on behalf of the government that it would be detrimental to the administration of the law in the courts of the United States to allow questions to jurors as to racial or religious prejudices. We think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute.

*Aldridge v. United States,* 283 U.S. 308, 314–15, 51 S.Ct. 470, 473, 75 L.Ed. 1054 (1931). Other courts have held similarly. *See, e.g., United States v. Affleck,* 776 F.2d 1451, 1454–55 (10th Cir.1985) (holding, in a case in which defendant feared religious bias, that trial court appropriately inquired into venire members' "religious affiliation" and "degree of credibility [they] would assign to a Mormon on the witness stand"); *State v. Fisher,* 141 Ariz. 227, 686 P.2d 750, 772 (1984) (en banc) ("The trial court may, at voir dire,

question and excuse venire members who would not be impartial for any reason, religious or otherwise."), *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984); *Coleman v. United States,* 379 A.2d 951, 954 (D.C.1977) ("Inquiry as to a juror's religious beliefs is proper on voir dire where religious issues are presented expressly in the case, or where a religious organization is a party to the litigation, or where it is a necessary predicate to the exercise of peremptory challenges."); *Congregation of the Passion v. Touche Ross & Co.,* 159 Ill.2d 137, 201 Ill. Dec. 71, 636 N.E.2d 503, 516 (1994) ("Generally, when religious affiliation is relevant to potential prejudice, subjects related to religious affiliation are proper subjects of inquiry on *voir dire.*"), *cert. denied,* 513 U.S. 947, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994); *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 143 A.2d 627, 632 (1958) ("[I]f the religious affiliation of a juror might reasonably prevent him from arriving at a fair and impartial verdict in a particular case ... the parties are entitled to ferret out ... the existence of bias or prejudice resulting from such affiliation."); *Alexander v. State,* 903 S.W.2d 881, 884 (Tex.App.1995) ("[T]he questionnaire's mere inquiry into the prospective jurors' religious affiliation did not violate [the defendant's] rights under the Equal Protection Clause.").

¶ 22 We believe that if Plaintiff's proposed question is properly deemed to be related to religion, it would nonetheless be permissible under the rationale of *Ball.* In that case, the Utah Supreme Court went to great lengths to clarify that juror bias, whether its source is religion or anything else, must be rooted out. *See* 685 P.2d at 1057–60. The *Ball* Court stated:

> Religious beliefs, unlike gender or race, are not readily apparent, and their existence, if directly related to the subject matter of the suit ..., must be determined by preliminary inquiry. Should ... religious beliefs (or the absence thereof) be the basis for *actual* bias, prejudice, or [ ]partiality, a challenge for cause

**9.** Similarly, this court has held that voir dire inquiry into religious affiliation is permissible "[w]henever a religious organization is a party to the litigation." *Hornsby v. Corporation of the*

*Presiding Bishop of the Church of Jesus Christ of Latter-day Saints,* 758 P.2d 929, 933 (Utah Ct. App.), *cert. denied,* 773 P.2d 45 (Utah 1988).

would ... lie. In that event, an individual would not be declared "incompetent ... on account of religious belief" in violation of the constitution, but rather unfit to serve in a particular cause because of actual prejudice. The fact that actual bias or prejudice is related in some way to an individual's religious beliefs does not preclude exclusion for demonstrated inability to serve as an impartial juror.

*Id.* at 1057 (emphasis and last omission in original) (quoting Utah Const. art. I, § 4).

¶ 23 The present case bears similarities to *Ball.* As in *Ball,* neither party in the instant case is a church.[10] Therefore, the concern in both cases stemmed not from the jurors' church membership but, rather, from their possible religious beliefs regarding issues pertinent to the case: alcohol consumption in *Ball* and missionary service in this case.[11] As Defendant was a missionary at the time of trial—in fact, he was physically absent from trial for that reason—the missionary-related religious beliefs of the Church's adherents serving on the jury could certainly influence those jurors' decisions in the case. And considering the heavy emphasis the Church places on missionary service, the influence could be at least as great as any alcohol-related bias was in *Ball.* Therefore, limited religious inquiry would have been appropriate since any missionary-related religious bias could have been the basis for a challenge for cause or, at least, an asset in the informed exercise of peremptory challenges.

### C. Adequacy of Substitute Question

▇▇▇ ¶ 24 As noted, the trial court, upon rejecting Plaintiff's proposed question, did ask the venire panel a substitute question in

**10.** In this respect, the present case and *Ball* are different from *Hornsby. See* note 9.

**11.** Defendant attempts to distinguish the present case from *Ball* on the grounds that alcohol consumption in *Ball* was related to the actual *crime* with which the defendant was charged, whereas missionary service in the present case is related to a *party.* Although this distinction is not groundless, *see Ball,* 685 P.2d at 1057 (permitting religious inquiry at voir dire when religious beliefs are "directly related to the subject matter of the suit"), it is not convincing. We must concern ourselves not with a bias's source but, rather, with the existence of bias itself.

its place: "Would the fact that ... the defendant[ ] is on a religious mission at the present time give you any problem in applying the facts in the law as you find it from the evidence in this case?" Defendant argues that this "broader question addressed the real issue—whether the jurors had any bias for or against ... [the Church's] missionaries. When the jurors responded in the negative, no further questioning was necessary."

▇▇▇ ¶ 25 Indeed, the court's question did "address[ ] the real issue." However, to say the question went far enough in eliciting the information Plaintiff was entitled to get "suggests an unwarranted naivety regarding human nature.... It is unrealistic to expect that any but the most sensitive and thoughtful jurors ... will have the personal insight, candor and openness to raise their hands in court and declare themselves biased." *State v. Ball,* 685 P.2d 1055, 1058 (Utah 1984).

¶ 26 The trial court's substitute question is an example of the kind of question that the Utah Supreme Court once characterized as a " 'stark little exercise.' " *State v. Saunders,* 1999 UT 59, ¶ 34, 992 P.2d 951 (quoting *State v. Worthen,* 765 P.2d 839, 845 (Utah 1988)). The Court characterized the "exercise" as

the all too prevalent practice of avoiding any real inquiry into possible bias by a trial judge's asking a prospective juror if he or she could decide the case fairly and follow the law given by the judge and then taking a prospective juror's affirmative answer as dispositive of the issue of bias.

*Id.* Especially in view of *Saunders,* we cannot conclude that the trial court's substitute question was adequate in this case.[12]

**12.** The Court of Appeals for the Ninth Circuit aptly observed:

A general inquiry concerning a juror's ability to try a case on the evidence presented at trial and the law provided by the court should, at least theoretically, serve to identify any bias that might preclude the juror from making an impartial decision. However, as a practical matter, such general inquiries are inadequate to alert the parties or the jurors themselves to potential sources of bias. If such a general question were adequate to identify prejudice, *voir dire* examination would, as a matter of course, be quite brief. A single, all-encom-

## D. Prejudice

¶ 27 Defendant correctly points out that any error made at voir dire must be prejudicial to require reversal. *See Barrett v. Peterson,* 868 P.2d 96, 102–03 (Utah Ct.App. 1993).

### 1. Ability to Change the Outcome of the Case

¶ 28 Defendant claims that if there was error in this case, it was not prejudicial error. He argues that even if the trial court had allowed Plaintiff's proposed question and Plaintiff had exercised all three of his peremptory challenges on venire members who had children on missions and, as a result, received three additional jury votes, he still would not have received the requisite six jury votes to win the case. *See* note 2.

¶ 29 However, this argument assumes that peremptory challenges are the only means for removing biased venire members. It ignores the fact that "[v]oir dire has two distinct and equally important purposes: the first is to detect actual juror bias—the basis of a 'for cause' challenge; and the second is to allow parties to collect sufficient information to intelligently exercise peremptory challenges." *Evans ex rel. Evans v. Doty,* 824 P.2d 460, 462 (Utah Ct.App.1991), *cert. denied,* 836 P.2d 1383 (Utah 1992). Defendant's argument does not address the possibility that the jurors' responses to Plaintiff's question and any appropriate follow-up questions could very well have resulted in dismissals for cause. *See Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion) ("Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."); *United States v. Dellinger,* 472 F.2d 340, 370 (7th Cir.1972) ("[T]he court's severe restriction of the voir dire may well have curtailed defendants' challenges for cause[.]"), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). In such a case, the trial court might have removed sufficient jurors to en-

passing and conclusory question would be sufficient.

able Plaintiff to gain enough votes from substitute jurors to win the case.

¶ 30 Of course, we cannot be certain that Plaintiff's proposed question would have resulted in any dismissals for cause. However, it would be unfair to give Defendant, rather than Plaintiff, the benefit of this doubt. Defendant was serving the same type of mission that many people in the same community had served. It seems very likely that many people in the community would have been able to sympathize with Defendant and possibly regard him as one who had, as Plaintiff puts it, "answer[ed] a higher call." Given the Utah Supreme Court's recognition of "the ease with which all issues of bias can be dispensed by the simple expedient of replacing a questionable juror with another whose neutrality is not open to question," as well as its instruction to trial judges to "err on the side of caution in ruling on for-cause challenges," *State v. Saunders,* 1999 UT 59,¶ 51, 992 P.2d 951, it does not seem unlikely that one or more jurors would have been excused for cause. *See* Utah R. Civ. P. 47 advisory committee note (encouraging trial judges "to exercise greater care in evaluating challenges for cause and to resolve legitimate doubts in favor of removal").

### 2. *State v. Menzies*

¶ 31 We take care to point out that this case is unlike *State v. Menzies,* 889 P.2d 393 (Utah 1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995), a case in which the Utah Supreme Court imposed a requirement for demonstrating prejudice in a related context. In *Menzies,* five venire members revealed at voir dire some feelings that the defendant believed evinced bias. *See* 889 P.2d at 397. The trial judge refused to dismiss the jurors for cause, so the defendant exercised peremptory challenges to dismiss them. *See id.* At the time of the trial, Utah courts adhered to the per se rule that the right to an impartial jury is violated and reversal is required "whenever a party is compelled 'to exercise a peremptory challenge to remove a panel member who should

*Darbin v. Nourse,* 664 F.2d 1109, 1115 n. 9 (9th Cir.1981).

have been stricken for cause.'" *Id.* at 398 (quoting *State v. Bishop,* 753 P.2d 439, 451 (Utah 1988)). However, the Utah Supreme Court overturned Utah's automatic reversal rule in favor of the more common approach, which requires that to show such a violation, one must "demonstrate prejudice, *viz.,* show that a member of the jury was partial or incompetent." *Id.* It recognized that " '[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the [Constitution] was violated.'" *Id.* (second alteration in original) (quoting *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988)).

¶ 32 Plaintiff has not shown, or even argued, that any specific juror in the present case was "partial or incompetent." *Id.* However, he did not need to do so because the *Menzies* rule does not apply to cases such as this one. The facts before the Court in *Menzies* involved five venire members who had revealed some feelings that arguably demonstrated bias. *See id.* at 397. The dispute in *Menzies* involved the question of whether, given the panel members' expressed attitudes, the trial court was obligated to dismiss them for cause. The present case involves a different and much more fundamental problem. In this case, the trial court did not even give the venire panel a meaningful opportunity to reveal any information about their possible biases regarding missionaries. As a result, of course, the proceedings did not advance to the point at which, as in *Menzies,* a dispute arose over whether the trial court should have granted a challenge for cause. Because the problem in this case occurred before, not after, the voir dire inquiry was made and possible biases revealed, this case is not one for which the *Menzies* rule, requiring a showing of actual prejudice, was designed.

¶ 33 Furthermore, it would be impossible, practically speaking, to apply the *Menzies* rule to cases like the instant one. To show the requisite partiality or incompetence of a juror under *Menzies,* a party must necessarily rely on information elicited at voir dire because voir dire is the only sanctioned opportunity a party has to learn about jurors.

Therefore, if the information is not revealed at voir dire, parties would have no information upon which to base a *Menzies* challenge, and the *Menzies* rule, while nice in theory, could never be put into practice in cases in which voir dire is improperly cut short.

### E. Conclusion on the Voir Dire Issue

¶ 34 Since it was prejudicial error for the trial court to prohibit Plaintiff's proposed question, we reverse the tainted judgment and remand this case for a new trial. However, given that Defendant has apparently now concluded his mission, we do not instruct the trial court to allow, on remand, questions at voir dire about the venire's associations with missionaries. Indeed, disclosure of Defendant's missionary service at this point would almost certainly be inappropriate. On remand, then, the trial court should evaluate all proposed questions according to whether they have an "apparent link to any potential bias," *State v. Saunders,* 1999 UT 59,¶ 43, 992 P.2d 951, or whether they would enable the requesting party " 'to exercise his peremptory challenges more intelligently.'" *State v. Worthen,* 765 P.2d 839, 845 (Utah 1988) (quoting *State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984)).

## III. DISCOVERY SANCTIONS

¶ 35 Rule 37 of the Utah Rules of Civil Procedure authorizes a trial court to award sanctions for discovery violations. Trial courts generally have "broad discretion regarding the imposition of discovery sanctions[,] . . . [and w]e will interfere only if an abuse of discretion is clearly shown." *Gorostieta v. Parkinson,* 2000 UT 99,¶ 31, 17 P.3d 1110. However, rule 37(d) limits a trial court's discretion concerning sanctions in the form of an award of expenses, stating that the court "shall" impose such sanctions "unless the court finds that the [discovery violation] was substantially justified or that other circumstances make an award of expenses unjust." Utah R. Civ. P. 37(d). *Cf. Lockette v. American Broad. Cos.,* 118 F.R.D. 88, 90–91 (N.D.Ill.1987) ("The usual sanction, which is mandatory, is that the recalcitrant party, his lawyer, or both pay the reasonable expenses and attorneys' fees resulting from the

failure. This sanction should not be imposed, however, if the failure to produce was substantially justified or if such an award would be unjust for other reasons.") (citation omitted) (interpreting federal rule 37(d), which is worded almost identically to Utah's rule 37(d)).

■ ¶ 36 Given this standard, we see no abuse of discretion in imposing sanctions against Plaintiff.[13] The trial court's order notes that Plaintiff "admi[tted] that the requested tax returns were in fact in his possession" while the discovery request was pending. Therefore, the trial court could fairly have found that it was not unjust to impose sanctions against him.

■ ¶ 37 However, the trial court's order contains no such findings as to Plaintiff's counsel, and for that reason we vacate the imposition of sanctions against counsel. The closest the order comes to placing any fault on Plaintiff's counsel is its observation, quoting, with our emphasis, from Defendant's response to Plaintiff's objections to Defendant's motion to compel discovery, that " 'the [medical] reports [appear to have been] in his *or* his client's possession [since October, 1996].' " This observation does not necessarily inculpate Plaintiff's counsel. It only recognizes that the fault "appear[ed]" to be either on counsel *or* on Plaintiff himself. An award of expenses against an attorney is unjust when the trial court finds nothing more than a mere possibility that the attorney was to blame for the discovery violation.[14]

¶ 38 A couple of other factors seem to cut against imposing sanctions against Plaintiff's counsel. The information and documents requested were personal and would typically be in Plaintiff's possession, not his counsel's. In fact, as noted, Plaintiff admitted that this was the case as to the requested tax returns. Also, Plaintiff's counsel represented that "everything that [he] had in [his] file had been provided to [Defendant's] counsel at the time of the deposition," which was approximately two and one-half months before the trial court imposed sanctions.

¶ 39 The trial court's order does not discuss any of the above circumstances. Therefore, we vacate the discovery sanctions against Plaintiff's counsel and remand so that the trial court can reassess counsel's personal involvement in the discovery violation. On remand, the trial court should consider whether counsel actually had possession of any of the requested documents and information, counsel's efforts to comply with the discovery request, and counsel's efforts to encourage Plaintiff to comply with (or ignore) the request.[15]

## IV. OTHER ISSUES RAISED ON APPEAL

¶ 40 "In light of our decision to remand for a new trial, it is not necessary to discuss

---

13. Furthermore, Plaintiff's brief does not request us to evaluate the propriety of sanctions against Plaintiff himself.

14. We are mindful of the fact that sanctions in the form of expenses are much more routine than are the nonmonetary sanctions authorized by rule 37, *see* Utah R. Civ. P. 37(d) (stating that expenses *"shall"* be imposed, whether "[i]n lieu of . . . or in addition" to other sanctions) (emphasis added), suggesting that a lower standard of culpability applies to monetary sanctions than to nonmonetary sanctions. *Cf.* Fed.R.Civ.P. 37(d) advisory committee notes ("If default is caused by counsel's ignorance of Federal practice or by his preoccupation with another aspect of the case, dismissal of the action and default judgment are not justified, but the imposition of expenses and fees may well be.") (citations omitted). Even so, we cannot ignore rule 37(d)'s instruction not to award even expense-oriented sanctions if the discovery violation was "substan-

tially justified" or if "other circumstances make an award of expenses unjust." Utah R. Civ. P. 37(d). We believe that an award of expenses is unjust when it is imposed against a person who had absolutely no fault for the discovery violation at issue, which, even according to the trial court's order as it now stands, might well be the case as to Plaintiff's counsel.

15. We realize that the trial court might have considered these matters in making its decision. However, without any such findings or recitations in the trial court's order, the basis for its order is unclear, making it impossible for us to evaluate whether the court's discretion was abused. *Cf. Young v. State*, 2000 UT 91, ¶ 12, 16 P.3d 549 (remanding award of deposition costs because trial court's failure to "explain the basis for the award" precluded appellate court from "determin[ing]" whether or not the trial court exceeded the permitted range of discretion").

[Plaintiff's] other alleged errors. However, since the trial court may be faced with the same issues on remand, we make the following observations."[16] *Hornsby v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, 758 P.2d 929, 934 (Utah Ct.App.), *cert. denied*, 773 P.2d 45 (Utah 1988).

¶ 41 First, as to Plaintiff's motions for a directed verdict and for a new trial, the case of *McCloud v. Baum*, 569 P.2d 1125 (Utah 1977), which both parties discuss at length in their briefs, appears to be very much on point. Although the facts of that case are slightly different from those of the present case, they are sufficiently similar so as to make the principles of that case control-

ling.[17] In *McCloud*, the Utah Supreme Court articulated the law and the standards of review for a directed verdict and for a new trial,[18] *see id.* at 1127, and it affirmed the denial of the plaintiff's motions for both. *See id.* at 1126. Contradictory to Plaintiff's argument in the present case, the Court recognized that "[a]n inference of negligence does not arise from the fact of collision alone involving a left-turning driver." *Id.* at 1127–28. The Court also recognized that "whether a reasonable person, exercising due care, would have apprehended an immediate hazard in executing a left turn" was "a question of fact ... [that t]he trial court properly submitted ... to the jury."[19] *Id.* at 1127. In view of *McCloud*, it appears that under

**16.** We note that the parties fully briefed each of the three issues addressed in this section: Plaintiff's post-trial motions, Officer Richan's expert testimony, and Defendant's award of deposition costs. Therefore, the guidance contained in this section is neither gratuitous nor uninformed.

**17.** Like the present case, *McCloud v. Baum*, 569 P.2d 1125 (Utah 1977), involved a motorcycle colliding with a left-turning automobile. *See id.* at 1126. Also, the jury in that case returned a verdict placing one hundred percent of the fault for the collision on the motorcycle driver, and the court entered judgment accordingly, denying the motorcycle driver's motions for a directed verdict and for a new trial. *See id.* The differences between the cases are (1) the skid mark left by the motorcycle in *McCloud* was 50 feet long, while Plaintiff's skid mark in the present case was 41 feet long; (2) the plaintiff motorcycle driver in *McCloud* had been following a truck and was, therefore, concealed from the automobile until the motorcycle entered the shoulder of the road to pass the truck, which was not true of the present case; and (3) the collision in *McCloud* took place in an intersection controlled by a flashing yellow light, while the collision in the present case did not occur at an intersection. *See id.*

**18.** The Court stated those standards as follows:

In reviewing a trial court's exercise of discretion upon a motion for a new trial, this court examines the record to determine whether the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust. If there be an evidentiary basis for the jury's decision, then the denial of the new trial must be affirmed.

In reviewing a trial court's rulings pertaining to motions for a directed verdict ..., this court reviews the evidence in the light most favorable to the non-moving party and to af-

ford him the benefit of all inferences which the evidence fairly supports. If reasonable persons could reach differing conclusions on the issue in controversy, a jury question exists and the motion should be denied.

*McCloud*, 569 P.2d at 1127 (footnotes omitted). The standard of review applicable to the denial of a motion for a new trial has changed in one significant way since *McCloud*. Utah appellate courts no longer "examine[ ] the record" to assess the evidence. Parties are now required, in their appellate briefs, to "marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991). A similar marshaling requirement applies to parties appealing the denial of a motion for a directed verdict. *See Water & Energy Sys. Tech., Inc. v. Keil*, 2002 UT 32, ¶ 15, 48 P.3d 888.

**19.** The "immediate hazard" language comes from Utah's right-of-way statute, which is found in Utah Code Ann. § 41–6–73 (1998). The version of the statute in effect at the time of *McCloud* read as follows:

"The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, during the time when such driver is moving within the intersection."

569 P.2d at 1127 (quoting prior version of Utah Code Ann. § 41–6–73). The statute today is similar to the prior version, having eliminated only the references to intersections:

The operator of a vehicle intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close to the turning vehicle as to constitute an immediate hazard.

Utah Code Ann. § 41–6–73 (1998). Notably, the "immediate hazard" language, which is the

Utah law, negligence in a case such as this one is a question of fact, and the trial court did not err in denying Plaintiff's motions for a directed verdict and for a new trial.[20] If the same issues arise on remand, the trial court in the instant case should rule consistently with the foregoing.

¶ 42 As for Officer Richan's testimony, we recognize that "trial courts have wide discretion in determining the admissibility of expert testimony." *State v. Kelley,* 2000 UT 41, ¶ 11, 1 P.3d 546. We also note that " '[t]he critical factor in determining the competency of an expert is whether that expert has knowledge that can assist the trier of fact in resolving the issues before it.' " *Id.* at ¶ 12 (quoting *Patey v. Lainhart,* 1999 UT 31, ¶ 15, 977 P.2d 1193). Given Officer Richan's training and experience in accident reconstruction, he certainly had knowledge that could assist the jury in making its decision. Therefore, it was within the trial court's discretion to allow Officer Richan to testify as an expert. If Plaintiff wishes to discredit the testimony, or if he wishes the jury to give little weight to it—two notions that are separate issues from the *admissibility* of the testimony, *see Alder v. Bayer Corp.,* 2002 UT 115, ¶ 60, 61 P.3d 1068—he is, of course, welcome to invite an expert witness of his own to contradict Officer Richan. But the mere fact that Plaintiff does not agree with the officer's methods does not convince us that the trial court abused its discretion in admitting the testimony.[21] If a party seeks to introduce, on retrial, Officer Richan's testimony for the same purpose as before, it will be well within the trial court's discretion to allow it.

¶ 43 Finally, we recognize that our decision necessitates that Defendant's award of deposition costs be vacated because Defendant is no longer the "prevailing party." Utah R. Civ. P. 54(d)(1) (allowing trial courts to award "costs ... as of course to the prevailing party"). If Defendant prevails on remand, the trial court should award deposition costs to Defendant only if the pertinent standard, set forth in *Young v. State,* 2000 UT 91, 16 P.3d 549, is satisfied:

> The general rule regarding the recovery of deposition costs is that a party may recover deposition costs as long as the " 'trial court is persuaded that [the depositions] were taken in good faith and, in the light of the circumstances, appeared to be essential for the development and presentation of the case.' " *Highland Constr. Co. v. Union Pac. R.R. Co.,* 683 P.2d 1042, 1051 (Utah 1984) (quoting *Frampton v. Wilson,* 605 P.2d 771, 774 (Utah 1980)).

*Young,* 2000 UT 91 at ¶ 6, 16 P.3d 549 (alteration in original).

¶ 44 In any event, the trial court should not award the costs for Defendant's videotaped deposition; these costs are not recoverable under *Young.* Although the information contained in the deposition—Defendant's version of the story—might have been "essential for the *development* ... of the case," *id.* (emphasis added), it was not "essential for the ... *presentation* of the case," *id.* (emphasis added), to convey the information via such an expensive manner as videotaped deposition rather than in-court testimony. It would be improper to allow parties, as Defendant attempts to do here, to absent themselves voluntarily from their own

phrase that the *McCloud* Court held constituted "a question of fact" for the jury, 569 P.2d at 1127, remains unchanged in the current version of the statute.

20. Plaintiff points us to various cases from other jurisdictions suggesting that negligence in cases such as this one is a legal question and not a factual one. If such were true, it would have been proper for the trial court to take the case out of the jury's hands, as Plaintiff requested. *See* Utah R. Civ. P. 59(a)(6) (authorizing trial judges to grant a new trial if the verdict is "against law"); *Cornia v. Wilcox,* 898 P.2d 1379, 1383 (Utah 1995) ("[A] motion for a directed verdict ... can be granted only when the moving

party is entitled to judgment as a matter of law."). However, the Utah Supreme Court has spoken on this issue, and we are bound to follow its reasoning. Our interpretation of the Court's *McCloud* opinion is that negligence in cases such as this one is a factual question.

21. Furthermore, we point out that it is debatable whether Officer Richan's testimony actually hurts Plaintiff's case. Plaintiff's counsel stated at oral argument that even if Plaintiff had been traveling at 46.08 miles per hour, the maximum possible speed calculated by Officer Richan, he would have been visible to Defendant for at least six seconds before the collision.

trial and still expect their opponent to cover the expense of providing their testimony, at least when it is the absent party, and not the opponent, who desires the testimony to be heard.[22]

### V. CONCLUSION

¶ 45 Due to the error made at voir dire, we reverse the jury's verdict and the ensuing judgment and remand for a new trial. We also vacate the imposition of discovery sanctions against Plaintiff's counsel and invite the trial court to reimpose them only if, after considering counsel's involvement in the discovery violation, it finds that it is just to do so. Finally, as to the issues discussed in Section IV of this opinion, which are technically mooted by our decision but likely to resurface on remand, we invite the trial court to follow the guidance that we have provided herein.

¶ 46 WE CONCUR: JUDITH M. BILLINGS, Associate Presiding Judge, and PAMELA T. GREENWOOD, Judge.

---

**22.** We further note that Defendant's counsel conceded at oral argument that if Defendant had chosen to attend trial, he would have been responsible for his own airfare to travel to Utah for trial. We will not allow him to shift the payment burden to Plaintiff simply by choosing not to attend trial.