2009 UT 52

**BODELL CONSTRUCTION COMPANY, Plaintiff and Appellant,**

v.

**Mark H. ROBBINS; Cherokee & Walker Investment Company, LLC; Cherokee & Walker, LLC; JPMorgan Chase Bank, N.A., Successor to Bank One, N.A.; and Does 1 through 50, Defendants and Appellees.**

No. 20070951.

Supreme Court of Utah.

Aug. 4, 2009.

James S. Jardine, Matthew R. Lewis, Erin Bergeson Hull, Salt Lake City, for plaintiff Andrew G. Deiss, Billie J. Siddoway, Salt Lake City, for defendant Mark H. Robbins.

John A. Beckstead, H. Douglas Owens, Romaine C. Marshall, Salt Lake City, for defendant JPMorgan Chase Bank.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 In this case, we must determine the scope of a settlement agreement between Michael Bodell and his company Bodell Construction Company (collectively, "Bodell"), on the one hand, and Marc Jenson and his company MSF Properties (collectively, "Jenson"), on the other. More specifically, we must determine whether Bodell and Jenson intended their settlement agreement to settle only the claims between themselves or whether they intended the settlement agreement to also settle related claims involving third parties, specifically Bank One and Mark Robbins.

¶ 2 Bank One and Robbins argued before the district court that the settlement agreement between Bodell and Jenson was an "accord and satisfaction," meaning that the agreement was not limited to the claims between Bodell and Jenson but satisfied all related claims even those with third parties. On this basis, Bank One and Robbins moved for summary judgment regarding claims that Bodell asserted against them. In response, Bodell argued that the agreement was not an accord and satisfaction but rather a "release," meaning that the agreement only released the named parties from the claims that they had against one another. The district court granted the summary judgment motion filed by Bank One and Robbins.

¶ 3 On appeal, Bodell asserts that the district court erred when it (1) granted summary judgment on the ground that the settlement agreement was unambiguously an accord and satisfaction and (2) struck the report of Bodell's damages expert.

¶ 4 Because we determine that the language of the settlement agreement unambiguously demonstrates that Bodell and Jenson intended the agreement to release only the claims they had against one another, not any third-party claims, we reverse the district court's grant of summary judgment. But we affirm the district court's decision to strike the report of Bodell's damages expert because we conclude that striking the report was within the district court's discretion.

## BACKGROUND

¶ 5 For purposes of the summary judgment motion, the parties did not dispute the following material facts. In January 2000, Robbins sold a 50 percent interest in his bicycle companies (collectively, "Vtrax") to Cherokee & Walker ("C & W"). Within weeks of this transaction, Robbins and C & W became dissatisfied with the business relationship. In May 2000, the parties agreed that Robbins would repurchase C & W's interest in Vtrax for $8 million. But Robbins

did not have $8 million. Consequently, Robbins missed several payment deadlines over the next few months. The directors of C & W grew impatient and threatened to seize control of Vtrax.

¶ 6 Robbins did not want to lose control of Vtrax, so he continued his search for a lender. During this search, Robbins became aware of the opportunity to acquire the popular "Mongoose" bicycle brand. Robbins knew he needed complete control over Vtrax in order to pursue the Mongoose acquisition. At this point, Robbins approached Jenson, the owner of a hard-money lending business, and asked Jenson for $8 million. Robbins explained that Vtrax was pursuing the acquisition of Mongoose but that in order for the acquisition to be finalized Robbins needed $8 million to buyout C & W's interest in Vtrax. After several negotiations, Jenson agreed to loan Robbins the $8 million necessary for the C & W buyout.

¶ 7 Jenson told Robbins that $4 million of the $8 million loan would come from Jenson's own money and Jenson would borrow the other $4 million from someone else. Accordingly, Jenson approached Bodell about the possibility of borrowing $4 million. Jenson informed Bodell that the $4 million Bodell contributed would be loaned to Robbins for the C & W buyout. Jenson also informed Bodell that Robbins was pursing the acquisition of Mongoose. Jenson had known Bodell for many years, and Bodell had recently loaned Jenson $1 million in a separate transaction. Yet Bodell was hesitant about lending such a large sum of money to Jenson without knowing the stability of Vtrax.

¶ 8 Jenson relayed Bodell's concerns to Robbins. Subsequently, Robbins approached Benjamin Lightner, Robbins's private banker at Bank One, and asked Lightner to draft a letter representing the stability of Vtrax. On August 22, 2000, Lightner wrote a letter (the "Lightner Letter") addressed to "Whom It May Concern." The Lightner Letter indicated that Robbins and Jenson would be depositing $165 million into a Bank One account for MadTrax, the company created by Robbins to pursue the acquisition of Mongoose. The deposit was to come from a loan agreement between MadTrax and Arimex Investments. In actuality, there was no loan agreement between MadTrax and Arimex. Still, Robbins gave a copy of the Lightner Letter to Jenson, who in turn gave a copy to Bodell.

¶ 9 Eight days after the Lightner Letter was written, Bodell loaned $4 million to Jenson. As planned, Jenson then took the $4 million from the Bodell loan and $4 million of his own money and loaned $8 million to Robbins to buy out C & W. Robbins paid C & W the required $8 million and obtained full control of Vtrax. Two months later, Robbins's efforts to acquire Mongoose failed and Vtrax collapsed. Robbins defaulted on his loan payment to Jenson, and, subsequently, Jenson defaulted on his repayment obligation to Bodell.

¶ 10 On March 18, 2003, Bodell and Jenson entered into a settlement agreement whereby Bodell released Jenson from all tort and contract claims in exchange for $3 million. Paragraphs 1 and 2 of the settlement agreement state as follows:

1. Contemporaneous with the execution and delivery of this Agreement, [Jenson] has caused $3,000,000 in immediately available funds to be delivered to [Bodell]. [Bodell] hereby acknowledges receipt of such funds.

2. Each of Bodell and BCC, for himself, itself, their affiliates and for all persons or entities claiming by, through or under him, it or them, hereby (a) *releases, acquits, waives and forever discharges MSF, its affiliates and their respective members, managers, officers, employees and agents (each, including without limitation Jenson, an "MSF Party") from any and all claims,* allegations of fraud, charges, demands, losses, damages, obligations, liabilities, grievances, causes of action, or suits at law and equity of whatsoever kind and nature, expenses, costs and attorneys fees, whether known or unknown, suspected or unsuspected, liquidated or unliquidated (each, a "Claim"), arising out of all past affiliations and transactions among Bodell, BCC and any MSF Party, including, but not limited to, the Loans and all related arrangements and transactions, (b) without limiting the generality of the foregoing,

acknowledges and agrees that *the obligations of the MSF Parties in connection with the Loans, including all principal and interest that may have been deemed to have accrued thereon, are hereby deemed fully satisfied and repaid in full.* (Emphasis added.)

¶ 11 Four months after executing the settlement agreement, Bodell filed suit against Bank One and Robbins claiming four causes of action: (1) fraud, (2) civil conspiracy, (3) negligent misrepresentations, and (4) unjust enrichment.

¶ 12 On October 29, 2003, Bank One and Robbins filed a motion for summary judgment. On March 15, 2004, Judge Bohling of the district court entered an order denying the motion for summary judgment filed by Bank One and Robbins. The district court held that (1) the settlement agreement was not an accord and satisfaction, and (2) an accord and satisfaction does not operate for the benefit of third parties unless the third parties are specifically referenced in the agreement.

¶ 13 During the discovery period, the case was reassigned to Judge Kennedy. Three weeks after the close of discovery, Bodell served the expert report of Merrill Weight (the "Weight Report") on Bank One and Robbins. The Weight Report included three new damages theories that were not disclosed during discovery. Bank One and Robbins filed a motion to strike the Weight Report. The district court granted the motion because Bodell had (1) not disclosed its alternative damages theories during fact discovery, (2) failed to show good cause for its failure to timely disclose, and (3) prejudiced the defendants by failing to disclose these theories.

¶ 14 Additionally, Bank One and Robbins renewed their initial motion for summary judgment and asked Judge Kennedy to revisit the question of whether the settlement agreement was an accord and satisfaction. At a hearing on September 10, 2007, Judge Kennedy granted summary judgment for Bank One and Robbins, ruling that (1) the settlement agreement was unambiguously an accord and satisfaction, and (2) an accord and satisfaction operates for the benefit of third parties. Thus, the district court held that the settlement agreement—as an accord and satisfaction—extinguished Bodell's claims of fraud and negligent misrepresentation asserted against Bank One and the claims of fraud, civil conspiracy, and unjust enrichment asserted against Robbins.

¶ 15 Bodell timely appealed. We have jurisdiction to consider Bodell's arguments on appeal pursuant to Utah Code section 78A–3–102(3)(j) (2008).

## STANDARDS OF REVIEW

¶ 16 We review a district court's interpretation of a contract for correctness, giving no deference to the district court.[1] Whether a contract is ambiguous is a question of law, which we also review for correctness.[2] We review a district court's decision to grant summary judgment for correctness, granting no deference to the district court's conclusions, and we view the facts and all reasonable inferences in the light most favorable to the nonmoving party.[3] We review discovery sanctions under an abuse of discretion standard.[4]

## ANALYSIS

¶ 17 We first consider Bodell's argument that the settlement agreement is a release rather than an accord and satisfaction. We conclude that the plain language of the settlement agreement unambiguously demonstrates that the parties to the agreement intended that the agreement operate only as a mutual release of claims rather than an accord and satisfaction of all claims, including those against third parties. Next, we consider Bodell's argument that the district court abused its discretion in striking the report of Bodell's damages expert. Because we deter-

1. *Sackler v. Savin,* 897 P.2d 1217, 1220 (Utah 1995).

2. *Peterson v. Sunrider Corp.,* 2002 UT 43, ¶ 14, 48 P.3d 918.

3. *Arnold Indus., Inc. v. Love,* 2002 UT 133, ¶ 11, 63 P.3d 721.

4. *Morton v. Cont'l Baking Co.,* 938 P.2d 271, 274 (Utah 1997).

mine that the district court did not abuse its discretion, we affirm the district court's decision to strike the expert report.

## I. THE SETTLEMENT AGREEMENT UNAMBIGUOUSLY RELEASES ONLY THE CLAIMS BETWEEN THE PARTIES NAMED IN THE AGREEMENT

█ ¶ 18 Bodell argues that the district court erred in ruling that the settlement agreement unambiguously settled Bodell's claims against nonparties to the agreement. More specifically, Bodell argues that the settlement agreement plainly released only those claims that Bodell and Jenson had against one another. In the alternative, Bodell argues that the settlement agreement was ambiguous and extrinsic evidence demonstrates that the parties intended to limit the settlement agreement to claims between Bodell and Jenson. We agree with Bodell's first argument, that the settlement agreement unambiguously released only those claims between Bodell and Jenson. Accordingly, we decline to consider any extrinsic evidence.

█ ¶ 19 "Settlement agreements are governed by the rules applied to general contract actions."[5] When we interpret a contract, or in this case a settlement agreement, we determine "the intent of the contracting parties" by "first look[ing] to the writing alone."[6] If the writing is unambiguous, we determine the intent of the parties exclusively from the " 'plain meaning of the contractual language.' "[7] Only where there is ambiguity in the terms of the contract may we ascertain the parties' intent from extrinsic evidence.[8] " 'A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.' "[9]

¶ 20 The settlement agreement between Bodell and Jenson is unambiguous because it is capable of only one reasonable interpretation. The language of the settlement agreement unambiguously demonstrates that Bodell and Jenson intended only to settle those claims that they had against one another. First, the agreement identifies the parties to the agreement:

> THIS SETTLEMENT AGREEMENT (this "Agreement") is entered into ... by and among BODELL CONSTRUCTION COMPANY, a Utah corporation ("BCC"), MICHAEL BODELL, an individual ("Bodell"), MARC S. JENSON, an individual ("Jenson"), and MSF PROPERTIES, L.L.C., a Utah limited liability company ("MSF").

As we use the terms in this opinion, Bodell and Jenson are the only parties named by the settlement agreement.[10] Then the settlement agreement plainly limits its terms to those named parties. It states,

> WHEREAS, the parties now desire to achieve a full settlement of all obligations, disputes and other matters outstanding *between them* . . . .
>
> 4. . . . MSF, Jenson, Bodell and BCC have definitely settled all matters *between them* . . . .
>
> 5. Each of the parties hereto understand and agree that this is a mutual release of claims and that following execution of this document, no Bodell Party shall have any claim against an MSF Party and no MSF Party shall have any claim against a Bodell Party. . . . (Emphases added.)

¶ 21 In addition to limiting its terms to the named parties, the settlement agreement

**5.** *R & R Indus. Park, L.L.C. v. Utah Prop. & Cas. Ins. Guar. Ass'n*, 2008 UT 80, ¶ 20, 199 P.3d 917 (internal quotation marks omitted).

**6.** *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 44, 201 P.3d 966.

**7.** *Id.* (quoting *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134).

**8.** *Id.; see also Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 2008 UT 3, ¶ 16, 178 P.3d 886.

**9.** *Giusti*, 2009 UT 2, ¶ 44, 201 P.3d 966 (quoting *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269).

**10.** We have defined "Bodell" to include both Michael Bodell and Bodell Construction Company. We have defined "Jenson" to include both Marc Jenson and MSF Properties.

also specifically names which parties are released from which claims. The agreement states,

> 2. Each of *Bodell* and BCC, for himself, itself, their affiliates and for all persons or entities claiming by, through or under him, it or them, hereby (a) *releases,* acquits, waives and forever discharges *MSF, its affiliates and their respective members, managers, officers, employees and agents (each, including without limitation Jenson, an "MSF Party")* from any and all claims, . . . arising out of all past affiliations and transactions among Bodell, BCC and any MSF Party, . . . acknowledges and agrees that *the obligations of the MSF Parties in connection with the Loans,* including all principal and interest that may have been deemed to have accrued thereon, *are hereby deemed fully satisfied and repaid in full* . . . . (Emphases added.)

There is no language to indicate that the parties intended to satisfy all of Bodell's potential tort and contract claims against persons not a party to the agreement.

¶ 22 Bank One and Robbins argue that because the settlement agreement includes the word "satisfied," we should construe the agreement to be an accord and satisfaction, or, in other words, to satisfy any and all related claims that the named parties may have against nonparties to the agreement. We disagree.

¶ 23 Accord and satisfaction is a common law concept.[11] It denotes the intention of the contracting parties to "agree that a different performance, to be made in substitution of the performance originally agreed upon, will discharge the obligation created under the original agreement."[12] An accord and satisfaction may discharge an obligation arising out of a "contract, quasi-contract, [or] tort."[13] When a claim is discharged through an accord and satisfaction, the claim is considered fully satisfied. The claimant no longer has the legal right to seek recovery from anyone on that claim.[14] Before we determine that an agreement constitutes an accord and satisfaction, we must find the following three elements in the contract: "(1) an unliquidated claim or a bona fide dispute over the amount due; (2) a payment offered as full settlement of the entire dispute; and (3) an acceptance of the payment as full settlement of the dispute."[15]

¶ 24 From a plain reading of the settlement agreement, we determine that the last two elements of an accord and satisfaction are not met. Although the agreement incorporated the offer of a payment by Jenson and the acceptance by Bodell in satisfaction of an obligation, the language of the agreement does not indicate that the payment was offered and accepted with the intent to satisfy the entire underlying dispute. Rather, the payment was offered and accepted as "a full settlement of all obligations, disputes and other matters outstanding *between them,* including, but not limited to, the Loans." (Emphasis added.) Thus, the plain language limits the effect of the payment to the settlement of the claims between Bodell and Jenson; claims as to third parties are not contemplated.

¶ 25 Robbins and Bank One contend that by including the term "satisfied" in the settlement agreement, Bodell necessarily released any claims he may have against Bank One and Robbins, even though Bank One and Robbins were not parties to the agreement. We disagree. The parties' use of "satisfied" in the settlement agreement does not alter our reading of the agreement. Indeed, we decline to adopt a rule that overlooks the contracting parties' clear intent and imputes a different meaning to a contract simply because the parties incorporated an otherwise

---

11. *See IFG Leasing Co. v. Gordon,* 776 P.2d 607, 614 n. 32 (Utah 1989).

12. *ProMax Dev. Corp. v. Raile,* 2000 UT 4, ¶ 20, 998 P.2d 254 (internal quotation marks omitted).

13. *Bennion v. LeGrand Johnson Constr. Co.,* 701 P.2d 1078, 1082 (Utah 1985).

14. *See* Arthur L. Corbin, Corbin on Contracts § 1276 (1962) ("Discharge by accord and satisfaction means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as *full satisfaction* of his claim." (emphasis added)).

15. *ProMax,* 2000 UT 4, ¶ 20, 998 P.2d 254.

ordinary term into their agreement. "Satisfied" appears only once in the agreement and is limited by surrounding language. The agreement states that Bodell "acknowledges and agrees that the obligations of [Jenson] in connection with the Loans ... are hereby deemed fully satisfied and repaid in full." Thus the word "satisfied" does not depict a full satisfaction of all underlying claims, as is characteristic of an accord and satisfaction; rather its impact is limited to "the obligations of [Jenson] in connection with the Loans." Thus, the settlement agreement satisfied only Jenson's loan obligation to Bodell. It did not satisfy any claims that Bodell may potentially have against Robbins or Bank One for full satisfaction of the debt owed.[16]

¶ 26 Because we determine that the plain language of the settlement agreement limited the agreement to claims between Bodell and Jenson, we reverse the district court's grant of summary judgment.[17] We now turn to the court's decision to strike the report of Bodell's damages expert.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN STRIKING THE WEIGHT REPORT

¶ 27 Three weeks after the close of discovery, Bodell served the Weight Report on Bank One and Robbins. The Weight Report included three new damages theories that were not disclosed during discovery. Bank One and Robbins filed a motion to strike the Weight Report. The district court granted the motion because Bodell had (1) not disclosed his alternative damages theories during fact discovery, (2) failed to show good cause for his failure to timely disclose, and (3) prejudiced the defendants by failing to disclose these theories.

¶ 28 Bodell argues that the district court abused its discretion in striking the Weight Report because Bodell's disclosure of the Weight Report did not violate any court order and complied with the Utah Rules of Civil Procedure. In the alternative, Bodell argues that even if the Weight Report was not properly disclosed, the court nevertheless abused its discretion in striking the report because there was good cause for the failure and the failure was harmless. Bank One and Robbins contest the merits of Bodell's arguments, and Bank One contends that this issue is not ripe for appeal. We first address Bank One's ripeness argument, and then we turn to the substance of Bodell's arguments.

### A. The Issue of Whether the District Court Erred in Striking the Weight Report Is Ripe for Appeal

¶ 29 A dispute is ripe "when 'a conflict over the application of a legal provision [has] sharpened into an actual or imminent clash of legal rights and obligations between the parties thereto.'"[18] An issue is not ripe for appeal if "'there exists no more than a difference of opinion regarding the hypothetical application of [a provision] to a situation in which the parties might, at some

---

**16.** Because we determine that the plain language of the settlement agreement demonstrates that the parties intended to limit the impact of their agreement to the claims between them, we do not reach Bodell's argument that the Liability Reform Act, found in Utah Code section 78B–5–822, prohibits this court from applying the agreement to claims Bodell may have against third parties.

**17.** Bank One argues that we should affirm the district court's grant of summary judgment on any of seven other theories that they presented to, but were not reached by, the district court. To serve judicial economy, we may affirm a district court's decision whenever the decision appealed from "is sustainable on any legal ground or theory apparent on the record." *Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158 (internal quotation marks omitted); *see also Bill*

*Nay & Sons Excavating v. Neeley Constr. Co.*, 677 P.2d 1120, 1123 (Utah 1984); *Limb v. Federated Milk Producers Ass'n*, 23 Utah 2d 222, 461 P.2d 290, 293 n. 2 (1969).

We decline to consider the alternative grounds in this case because we do not see that doing so will serve judicial economy. The district court is already familiar with the alternative theories as they have been fully briefed and argued to that court. Accordingly, we determine that the district court is in a better position than we are at this time to rule on Bank One's alternative theories.

**18.** *Bd. of Trs. of Wash. County Water Conservancy Dist. v. Keystone Conversions, L.L.C.*, 2004 UT 84, ¶ 32, 103 P.3d 686 (alteration in original) (quoting *Redwood Gym v. Salt Lake County Comm'n*, 624 P.2d 1138, 1148 (Utah 1981)).

future time, find themselves.' " [19] If, however, an issue was "raised, argued, and resolved by the trial court prior to the entry of" a final judgment, then that issue is ripe for appeal, and the "failure to raise [it] on appeal result[s] in a waiver of the[ ] right to raise [it] at a later time." [20]

¶ 30 Bank One argues that the issue of whether the district court erred in its decision to strike the Weight Report is not ripe for appeal because there may be some future scenario in which an appellate court would not have to reach the issue. That future scenario would occur if the district court, on remand, were to enter summary judgment on one of Bank One's alternative theories, the case settled, or the case eventually reaches a jury and the jury finds against Bodell. To support its position, Bank One relies upon *Pett v. Autoliv ASP, Inc.*[21] and *State v. Ortiz.*[22]

¶ 31 In *Pett*, we granted an interlocutory appeal challenging a district court's decision to grant a party leave to amend an answer to plead a particular affirmative defense.[23] The respondent asked us to determine whether Utah law recognized the affirmative defense that the petitioner sought to plead.[24] We declined to determine the scope of Utah law as it related to the affirmative defense because we determined that the issue had not "matured to the extent that we [could] know with certainty the facts and law which [would] shape its final outcome." [25]

¶ 32 In *Ortiz*, two defendants challenged the sentencing structure applicable to the crimes with which they were charged.[26] Because the defendants had not yet been convicted, we determined that the challenge was not ripe. We stated, "there are several possible circumstances under which we would

not need to address the constitutionality of [the sentencing structure]." [27]

¶ 33 In both *Pett* and *Ortiz*, the challenged law had not yet been applied to the parties, and we determined that without such application the challenges were not ripe. This case is markedly different. Bodell has sought to submit the Weight Report, and the district court, applying Utah Rule of Civil Procedure 37(f) to the facts, struck the report. Though it is possible that the case could be later decided or settled on issues unrelated to the information in the Weight Report, the admissibility of the Weight Report is still properly before us. The issue has been squarely presented to the district court, the court has ruled on the issue, the issue was ripe when the court ruled on it, and the court has issued a final judgment. Accordingly, we conclude that the issue is ripe for our determination.

### B. The District Court Did Not Abuse Its Discretion in Striking the Weight Report

¶ 34 Bodell argues that the district court erred in striking the Weight Report because the disclosure of the report complied with the Utah Rules of Civil Procedure, and even if the disclosure had violated the rules, allowance of the report would not have harmed the defendants. Further, Bodell claims that he had good cause for his failure to previously disclose the information in the report. Bank One and Robbins argue that because Bodell did not disclose the damages theories in the Weight Report during initial disclosures or discovery, the district court was within its discretion to strike the Weight Report rather than reopen discovery. We determine that (1) Bodell violated Utah Rule of Civil Procedure 26 when he failed to disclose the theories in the Weight Report be-

19. *Id.* (alteration in original) (quoting *Redwood Gym*, 624 P.2d at 1148).

20. *DeBry v. Cascade Enters.*, 935 P.2d 499, 502 (Utah 1997) (citing *State ex rel. Road Comm'n v. Rohan*, 28 Utah 2d 375, 503 P.2d 141 (1972)); *see also Smith v. DeNiro*, 28 Utah 2d 259, 501 P.2d 265 (1972).

21. 2005 UT 2, 106 P.3d 705.

22. 1999 UT 84, 987 P.2d 39.

23. 2005 UT 2, ¶ 3, 106 P.3d 705.

24. *Id.*

25. *Id.* ¶ 5.

26. 1999 UT 84, ¶ 1, 987 P.2d 39.

27. *Id.* ¶ 4.

fore the close of fact discovery and (2) it was within the district court's discretion to find that Bodell's failure to disclose harmed Bank One and Robbins and that Bodell did not have good cause for its failure to disclose the theories in a timely manner.

¶ 35 Rule 26 of the Utah Rules of Civil Procedure requires that a party disclose the "computation of any category of damages claimed by the disclosing party" during initial disclosures.[28] When a party fails to make timely disclosure, the district court is required to impose discovery sanctions on that party unless the "failure to disclose is harmless or the party shows good cause for the failure to disclose."[29] The district court has "broad discretion regarding the imposition of discovery sanctions."[30] In applying the abuse of discretion standard to the district court's imposition of a particular sanction, we give the district court "a great deal of latitude in determining the most fair and efficient manner to conduct court business" because the district court judge "is in the best position to evaluate the status of his [or her] cases, as well as the attitudes, motives, and credibility of the parties."[31] Thus, we will determine that a district court "has abused its discretion in choosing which sanction to impose only if there is either an erroneous conclusion of law or no evidentiary basis for the [district] court's ruling."[32]

¶ 36 We determine that in this case there was a sufficient evidentiary basis for the district court to exclude the Weight Report. The damages theories advanced in the Weight Report were not disclosed during the requisite discovery period. During initial disclosures, Bodell disclosed that its damages "constitute the funds advanced, together with interest at the legal rate, less the payment received from MSF." In response to a request for admission from Bank One, Bodell clarified that he sought interest at the legal rate as provided in Utah Code sections 15–1–1 and 15–1–4, which provide that interest shall accrue at "10% per annum" unless the parties "specify a different rate of interest."[33] Neither Bodell and Bank One nor Bodell and Robbins had specified a different interest rate.[34] Thus, the district court was correct when it concluded that Bodell disclosed only the following damages: "$4 million, less payments received, plus interest at the *statutory rate*."

¶ 37 It was not until three weeks after fact discovery closed that Bodell served the Weight Report on Bank One and Robbins. The Weight Report included three new damages theories, including the Benefit of the Bargain Rule, the Modified Benefit of the Bargain Rule, and the Comparable Rate of Return theory. Bank One and Robbins moved to strike the Weight Report because they did not have the opportunity to conduct discovery regarding facts essential to these theories. According to Bank One and Robbins, essential facts included Bodell's loan history; the loan histories and practices of those to whom Bodell could have and would have allegedly loaned money in lieu of MSF; the capabilities of MSF and Jenson to repay

**28.** Utah R. Civ. P. 26(a)(1)(C).

**29.** Utah R. Civ. P. 37(f).
Rule 37(f) allows for either the exclusion of the untimely disclosure or any other sanctions "authorized by Subdivision (b)(2)." Other available sanctions include "order[ing] the [non-compliant] party or the attorney to pay the reasonable expenses, including attorney fees, caused by the failure." Utah R. Civ. P. 37(b)(2)(D).

**30.** *Morton v. Cont'l Baking Co.*, 938 P.2d 271, 274 (Utah 1997) (internal quotation marks omitted).

**31.** *Id.* at 275.

**32.** *Id.* at 274 (citations and internal quotation marks omitted).

**33.** Utah Code Ann. § 15–1–1(2) (2005).

**34.** Bodell contends that his discovery responses referred to the contractual interest rate in the Promissory Note between Bodell and MSF. However, Bank One and Robbins were not parties to that note and, therefore, are not bound by it. *See Taylor, Cotton & Ridley, Inc. v. Okatie Hotel Group, L.L.C.*, 372 S.C. 89, 641 S.E.2d 459, 464 (S.C.Ct.App.2007) (holding that the home owner was bound only to the statutory interest rate where the owner was not party to the contract wherein the general contractor and the subcontractor agreed to a higher interest rate); *see also Casaccio v. Habel*, 14 Ill.App.3d 822, 303 N.E.2d 548, 551 (Ill.App.Ct.1973) (determining that a nonparty to an agreement is not subject to the high interest rates of that agreement).

or obtain financing to repay the $4 million loan at the time the loan was made; and Bodell's expenses, investments, and credit history at the time the loan was made. The district court agreed: "the defendants will suffer prejudice if Bodell were allowed to present these damages theories at trial because these claims and the bases for them were not disclosed during fact discovery and defendants are now unable to conduct fact discovery to rebut those theories." Though the district court could have reopened fact discovery to allow for these theories, the court was not obligated to do so. Thus, the court's finding of prejudice to Bank One and Robbins was correct.

¶ 38 Bodell contends that he had good cause for his failure to comply with rule 26. Particularly Bodell argues that he "complied with generally accepted litigation practices" when he "disclosed its damages theories during fact discovery and then laid them out in greater detail in an expert report produced during the expert discovery period." We are unpersuaded. As we stated previously, Bodell's reference to Utah Code sections 15–1–1 and 15–1–4 was insufficient to constitute disclosure of the "computation of any category of damages claimed by the disclosing party," particularly the Benefit of the Bargain Rule, the Modified Benefit of the Bargain Rule, and the Comparable Rate of Return theory.

¶ 39 Because Bodell's disclosure of the Weight Report failed to comply with rule 26, allowing the report would have prejudiced Bank One and Robbins, and Bodell failed to show good cause for his failure, we affirm the district court's decision to exclude the Weight Report.

## CONCLUSION

¶ 40 The language of the settlement agreement between Bodell and Jenson unambiguously demonstrates that Bodell and Jenson intended the agreement to release only the claims they had against one another, not any third-party claims they may have. Accordingly, we reverse the district court's grant of summary judgment. But we affirm the district court's decision to strike the Weight Report. In light of the facts that Bodell failed to timely disclose the damages theories contained in the report, late disclosure of the theories would have prejudiced Bank One and Robbins, and Bodell failed to show good cause for his untimeliness, striking the report was within the discretion granted to the district court by Utah Rule of Civil Procedure 37(f).

¶ 41 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Judge WILLMORE concur in Associate Chief Justice DURRANT's opinion.

¶ 42 Having disqualified himself, Justice WILKINS does not participate herein; District Judge THOMAS L. WILLMORE sat.