IN THE UTAH COURT OF APPEALS

----ooOoo----

PC Crane Service, LLC, a Utah limited liability company; Lacy, LLC, a Utah limited liability company; David Paul Belcher, Vernon Belcher, and Paul David Belcher, individuals,

    Plaintiffs, Appellees, and Cross-appellants,

v.

McQueen Masonry, Inc., a Utah corporation; Central Equipment, LC, a Utah limited liability company; McQueen Crane Services, LC, a Utah limited liability company; and James McQueen, an individual,

    Defendants, Appellants, and Cross-appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

OPINION

Case No. 20090791-CA

F I L E D
(March 1, 2012)

2012 UT App 61

-----

Third District, Salt Lake Department, 060915007
The Honorable Robin W. Reese

Attorneys:     Bruce A. Maak, Salt Lake City, for Appellants and Cross-appellees
           Matthew C. Barneck and Paul P. Burghardt, Salt Lake City, for Appellees and Cross-appellants

-----

Before Judges Voros, Thorne, and Roth.

ROTH, Judge:

¶1     McQueen Masonry, Inc.; Central Equipment, LC; McQueen Crane Services, LC; and James McQueen (collectively, McQueen) appeal two orders of the district court. First, McQueen contends that the district court erred in denying its motions for attorney fees and costs. Second, it argues that the district court's order that PC Crane Service, LLC; Lacy, LLC; David Paul Belcher; Vernon Belcher; and Paul David Belcher (collectively, PC Crane) pay $7475 in sanctions for discovery abuse was inadequate. PC Crane cross-appeals the entry of sanctions against it, asserting that the district court failed to make a finding that sanctions were warranted and that the record itself does not support the entry of sanctions. PC Crane also asserts that the district court erred in awarding McQueen its deposition costs both because there were alternative means of collecting the information and because the depositions were not used at trial. We affirm the denial of attorney fees and the award of deposition costs but remand for reconsideration of the sanctions award in accordance with this opinion.

BACKGROUND

¶2     This appeal stems from a dispute over the purchase of goodwill associated with four construction cranes. In October 2004 and spring 2005, PC Crane, a company owned by the Belchers, entered into agreements with McQueen to purchase the four cranes and their associated goodwill (the purchase agreements). Goodwill is generally defined as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business." *Black's Law Dictionary* 763 (9th ed. 2009). The most valuable component of the goodwill here was the customer base. Maintaining the customer base required the continued association of Lon Stam, a well-known and successful crane broker who had negotiated the crane-hire operations for McQueen, to attract business for PC Crane after the cranes' change in ownership. In conjunction with the purchase agreements, PC Crane executed two promissory notes, one in the amount of $228,800 and a second in the amount of $132,600, to pay the cost of the goodwill (the goodwill notes).[1] Each goodwill note provided for monthly installment payments to be paid over a three-year period, followed by a lump sum payment of the balance. Both notes were secured by a deed of trust to real property owned by Lacy, LLC and were

---

1. The second goodwill note actually promised payment of $177,600, of which $132,600 was designated for the goodwill.

personally guaranteed by Lacy, LLC; David Belcher; and Vernon Belcher (collectively, Guarantors).

¶3     PC Crane filed this lawsuit in September 2006. In the complaint, PC Crane asserted that McQueen failed to deliver the goodwill contemplated in the purchase agreements. As a consequence, PC Crane sought to recover payments made under the goodwill notes and to terminate its continuing obligations under the notes and the purchase agreements. During the course of the litigation, PC Crane continued to make timely payments under the goodwill notes until October 2007, when the lump sum payment of $123,379.74 required by the first note came due. In November 2007, however, the parties entered into a stipulation under which PC Crane agreed to continue paying its monthly installments on the second goodwill note and McQueen agreed that the lump sum payments due under both notes would be deferred until final resolution of this case. As part of the stipulation, McQueen also agreed "to stay any action to . . . enforce, collect, or otherwise declare [PC Crane] . . . in default of [its] obligations under the [goodwill n]ote[s]" while the litigation was pending. On August 27, 2008, approximately two months prior to trial, PC Crane paid in full the remaining balance on both notes.[2] A jury eventually resolved all of the claims in McQueen's favor, and neither party challenges the jury verdict on appeal. Rather, the parties are concerned with the district court's orders on post-trial motions for attorney fees, sanctions, and deposition costs.

¶4     Following the jury trial, McQueen moved to disqualify Judge L.A. Dever, who had presided over the case to that date. Judge Dever granted the motion, and the case was reassigned to Judge Robin W. Reese. Judge Reese's only role in the litigation was to decide McQueen's post-trial motions, which included two motions for attorney fees under the contracts; its second motion for discovery-related sanctions, which had been filed before trial but never resolved; and its motion for costs. Judge Reese denied the motions for attorney fees because he concluded that a precondition to the collection of attorney fees--a default--had never occurred under the terms of any of the documents. McQueen's second motion for sanctions asked the court to award sanctions against PC Crane for conduct during discovery that had formed the subject of McQueen's first motion for sanctions, which Judge Dever did not grant because, "at th[e] time," neither party's conduct appeared to warrant sanctions, and for subsequent pretrial conduct.

---

2. PC Crane paid off the notes prior to the entry of final judgment in exchange for McQueen's release of its security interest in the real property and reconveyance of the deed of trust.

McQueen characterized Judge Dever's earlier refusal to award sanctions "at this time" as a deferral of a final decision on the sanctions issue pending further proceedings, but Judge Reese concluded that Judge Dever had denied McQueen's previous request for sanctions, and he declined to disturb that decision. However, Judge Reese awarded sanctions against PC Crane for its subsequent conduct, based on his determination that in response to McQueen's repeated requests for relevant information, PC Crane took an "inconsistent[]" position on an issue that was central to McQueen's defense and stymied the discovery of information that should have been revealed much earlier in the discovery process. Therefore, he awarded McQueen its fees incurred in bringing the second sanctions motion--$7475. Finally, Judge Reese allowed McQueen to recover certain deposition expenses as costs under rule 54(d) of the Utah Rules of Civil Procedure.

¶5 On appeal, McQueen asserts that Judge Reese erred in denying its motions for contractual attorney fees and that the sanctions award did not adequately compensate it for the tens of thousands of dollars it spent combating PC Crane's discovery abuse. PC Crane challenges the sanctions award as unsupported both because Judge Reese failed to make a finding that PC Crane's behavior in fact warranted sanctions and because the record demonstrates that its behavior was not sanctionable. PC Crane also cross-appeals the award of deposition costs, arguing that the award was unwarranted because the depositions were unnecessary and were not used during trial.

ISSUES AND STANDARDS OF REVIEW

¶6 McQueen appeals the denial of its request for attorney fees, arguing that it is entitled to attorney fees under the goodwill notes, the deed of trust, and the guaranty. We review the denial of an award of attorney fees as a matter of law for correctness. *See EDSA/Cloward, LLC v. Klibanoff*, 2008 UT App 284, ¶ 8, 192 P.3d 296. Because we are reviewing the denial of fees under contract, we must also review the district court's interpretation of the contract language for correctness. *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263.

¶7 Both parties challenge the district court's award of $7475 in discovery sanctions. When reviewing the imposition of sanctions under rules 37 and 26 of the Utah Rules of Civil Procedure, appellate courts first consider whether "the district court has made a factual finding that the party's behavior merits sanctions." *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 (considering when rule 37 sanctions may be imposed); *see also* Utah R. Civ. P. 26(g) (requiring sanctions if the court finds that a

certification upon a discovery response is made in violation of the rule). We will uphold any such finding unless it is clearly erroneous. *See Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177. If such a finding has been made, we will not disturb the amount of the sanction unless "abuse of discretion [is] clearly shown." *See Kilpatrick*, 2008 UT 82, ¶ 23 (alteration in original) (emphasis omitted) (internal quotation marks omitted) (discussing rule 37); *accord Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 35, 215 P.3d 933 (discussing rule 26). "An abuse of discretion may be demonstrated by showing that the district court relied on 'an erroneous conclusion of law' or that there was 'no evidentiary basis for the trial court's ruling.'" *Kilpatrick*, 2008 UT 82, ¶ 23 (quoting *Morton v. Continental Baking Co.*, 938 P.2d 271, 274 (Utah 1997)).

¶8 Finally, PC Crane challenges the award of deposition costs to McQueen. We review the district court's decision awarding costs to the prevailing party for abuse of discretion. *See Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶¶ 78, 84, 201 P.3d 966.


ANALYSIS

I. Attorney Fees

¶9 McQueen argues that the district court improperly denied its requests for attorney fees. In Utah, a district court generally may not award attorney fees unless provided for by contract or statute. *See IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 39, 196 P.3d 588. When awarded pursuant to a contract, attorney fees are "allowed only in accordance with the terms of the contract." *Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 671 (Utah 1982). Thus, the party "seeking an award of attorney fees under a contract must establish that the contract's terms anticipate such an award." *Maynard v. Wharton*, 912 P.2d 446, 451 (Utah Ct. App. 1996). In this case, the pertinent contractual documents involved in the crane transaction were the purchase agreements, the goodwill notes, the deed of trust, and the guaranty. The parties agree that neither of the purchase agreements contains an attorney fee provision. McQueen therefore sought an award of attorney fees under the attorney fee provisions of the other documents, all of which McQueen claims were implicated by PC Crane's legal efforts to rescind its obligation to pay for the goodwill and to recover payments previously made. The trial court declined to award fees under those documents, concluding that none of the fee provisions were applicable under the facts of the case. McQueen asserts that this conclusion was error.

¶10 McQueen also now seeks attorney fees pursuant to Utah Code section 78B-5-826 (the reciprocal attorney fees statute), which permits a court to award "attorney fees to

either party that prevails in a civil action based upon any promissory note, written contract, or writing . . . when the provisions of the promissory note, written contract, or other writing allow at least one party to recover attorney fees," Utah Code Ann. § 78B-5-826 (2008). Although McQueen did not raise this issue in the district court, it asserts that this court's recent decision of *Hooban v. Unicity International, Inc.*, 2009 UT App 287, 220 P.3d 485 (mem.), *cert. granted*, 225 P.3d 880 (Utah Jan. 20, 2010) (No. 20090932), which was decided after the denial of attorney fees in the present case, creates a new basis for its request for statutory attorney fees.

¶11 We first address McQueen's contractual claims and then turn to its statutory claim for attorney fees.

A. Contractual Fees

¶12 Much of the discussion in the briefs and at oral argument centers on which of the six written agreements entered into by the parties--the two purchase agreements, the two goodwill notes, the deed of trust, and the guaranty--were actually at issue in the 2006 litigation and could thus theoretically provide a basis for an award of attorney fees. PC Crane asserts that the underlying dispute involved only a claim of breach of the purchase agreements, which undisputedly do not contain any attorney fee provisions. According to McQueen, however, PC Crane's legal efforts to rescind its obligation to pay for the goodwill and to recover payments already made implicated all six agreements. Because the purchase agreements do not allow for the collection of attorney fees, McQueen sought to recover its attorney fees pursuant to the other four documents.

¶13 We agree with McQueen that the scope of the litigation reasonably extends to the two goodwill notes and the deed of trust because they implement and secure PC Crane's obligations to pay for the disputed goodwill and all three documents are incorporated by reference into the purchase agreements. We therefore must consider whether the district court properly concluded that attorney fees were not available to McQueen under any of those documents. With regard to the guaranty, however, we determine that the litigation was too tenuously and tangentially related to it to trigger its attorney fee provision.

1.  The Goodwill Notes

¶14  PC Crane executed two goodwill notes, which covered the purchase price of the goodwill associated with the cranes.  Both notes are incorporated by reference into the purchase agreements.  They also contain identical attorney fee provisions, which are found in the "Remedies" section of each note:

> 3.  Remedies. *In the event of a default under this Promissory Note*, [McQueen], at its option, may take any one or more of the following actions:
>
> 3.1.  Acceleration and Legal Action.  Declare the entire unpaid principal balance of the debt . . . and all interest on such debt and all other costs and expenses . . . to be immediately due and payable . . . and commence legal action for collection and enforcement of the Promissory Note, including all costs and *reasonable attorney[] fees incurred in connection therewith*.

(Emphases added.)  The notes each provide that "[a] default shall occur under this Promissory Note if" (1) PC Crane "fails to make any payment" under the note; (2) PC Crane becomes insolvent or files for bankruptcy; (3) PC Crane fails to make payment due "under any other promissory note" held by McQueen within fifteen days of written notice; or (4) a default occurs under either the deed of trust or the security agreement.[3]

¶15  McQueen does not challenge the district court's finding that none of the specific events identified as a default in the goodwill notes had occurred.[4]  Rather, it argues that

---

3.  The parties executed a separate security agreement to secure the payment of the goodwill notes and certain other notes.  That security agreement does not contain an attorney fee provision and is not at issue in this appeal.

4.  A payment default actually did occur in October 2007 when PC Crane failed to make the lump sum payment due on the first goodwill note.  The district court, however, considered, and rejected, an argument that McQueen was entitled to attorney fees based on this default.  Although the court recognized the failure to make the payment as an act of default under the documents, it determined that McQueen had "waived any right

(continued...)

PC Crane's payment of the note obligations to avoid default, followed by a suit to recover those payments and avoid future payments, was the practical equivalent of "Failure to Make Payments" and that the district court erred in concluding that it was not. According to McQueen, "there is no difference in substance between a refusal to make a payment and the making of a payment and suing for its recovery," and the court's decision otherwise would simply allow PC Crane to "avoid its liability for legal fees." While this equivalency argument has some appeal, in that the result of both a failure to pay and a declaratory judgment that the notes were unenforceable would be the same--nonpayment--the language of the goodwill notes themselves does not support it. By linking McQueen's entitlement to attorney fees to an event of default and then specifically delimiting such events of default, the parties plainly expressed their intent to limit the attorney fees trigger to an actual default, not to the functional equivalent of a default. That is, McQueen is entitled to collect attorney fees "incurred in connection" with any "legal action for collection and enforcement of the Promissory Note," but only "[i]n the event of a default"--in this instance, a "Failure to Make Payments."

¶16    "When a contract requires, as this one does, that the defaulting party pay attorney fees, 'the sole criterion for [a party] to obtain attorney fees . . . is to show default by the other contract party.'" *Jones v. Riche*, 2009 UT App 196, ¶ 3, 216 P.3d 357 (mem.) (alteration and omission in original) (quoting *Foote v. Clark*, 962 P.2d 52, 54-55 (Utah 1998)). Default, however, must have occurred "in accordance with the terms of the contract." *Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 671 (Utah 1982); *see also IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 39, 196 P.3d 588 ("Fees provided for by contract . . . are allowed only in strict accordance with the terms of the contract."). Thus, McQueen "must establish that the contract's terms anticipate such an award." *Maynard v. Wharton*, 912 P.2d 446, 451 (Utah Ct. App. 1996); *cf. IHC Health Servs., Inc.*, 2008 UT 73, ¶ 43 (reversing award of attorney fees where action to eject a tenant after the plaintiff had terminated the lease was not instituted during the term of the lease, as required by the lease's attorney fee provision); *Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 267, 269 (Utah 1992) (declining to award attorney fees associated with

---

4. (...continued)
to act upon [PC Crane's] default" when it had agreed, in a November 2007 stipulation, to "stay any action to foreclose, enforce, collect, or otherwise declare [PC Crane] . . . in default of [its] obligations under the [goodwill notes]." McQueen does not challenge this determination, and we therefore must accept that the parties' stipulation eliminated the October 2007 default.

collecting rent for a holdover period after the lease expired because the lease expressly permitted attorney fees only for the collection of rent under the lease). McQueen cannot do so here. Though McQueen would not be fully paid under the notes in either instance, the distinction between obtaining a declaration that there is no legal obligation to pay under a contract and simply failing to make the required payments under that contract is a real one; only the latter instance is a default as the notes define that term.

¶17 The supreme court resolved a similar issue in the case of *Faulkner v. Farnsworth*, 714 P.2d 1149 (Utah 1986) (per curiam). There, the buyers had purchased real property from the sellers and were making payments on the purchase price. *See id.* at 1150. The sellers, however, still owed money to their predecessor-in-interest on the same property. *See id.* Once the buyers had paid down the balance to an amount equal to what the sellers owed their predecessor, the buyers demanded that the sellers convey title to them. *See id.* A jury found in favor of the sellers, and the trial court awarded attorney fees under the purchase contract to them. *See id.* The contract, however, provided for attorney fees only in the event of default. *See id.* The supreme court noted that the buyers "were current in their payments" and, therefore, not in default. *See id.* Consequently, it reversed the trial court's award of attorney fees, stating, "The contractual language does not award attorney fees to the prevailing party who succeeds in enforcing the agreement, but against the defaulting party whose default necessitates enforcement. As neither party was held in default, neither was entitled to attorney fees." *Id.* at 1151. *See also B. Inv. LC v. Anderson*, 2012 UT App 24, ¶¶ 31, 33, 700 Utah Adv. Rep. 51 (affirming the denial of attorney fees to a party who prevailed in the trial court because the action for declaratory judgment did not result in the "failure to comply with any of the [contract] provisions," a prerequisite for collecting attorney fees (internal quotation marks omitted)).

¶18 The bargain that the parties struck in the goodwill notes provided PC Crane with the ability to challenge the enforceability of its payment obligations in court without the risk that it would be required to pay McQueen's attorney fees should it lose, so long as PC Crane did not commit a default under the notes while it did so. Although the result may seem unfair from McQueen's perspective, we cannot reform the parties' agreements to insert provisions that, in hindsight, might seem desirable or even reasonable. *See generally Rio Algom Corp. v. Jimco, Ltd.*, 618 P.2d 497, 505 (Utah 1980) (holding that a court cannot interpret a contract in a manner that makes a better contract than the parties bargained for themselves). Here, because the goodwill notes limit an award of attorney fees only to the occurrence of specific events of default, and McQueen has not shown that any such default occurred here, we conclude that the

district court did not err when it refused to award attorney fees to McQueen under the goodwill notes.

> 2. Deed of Trust

¶19   McQueen also seeks to recover attorney fees under the deed of trust. The deed of trust secures PC Crane's obligations under the goodwill notes by providing a security interest in real property owned by Lacy, LLC, another entity held by the Belchers. The "Remedies" provision of the deed of trust, however, is conditioned in much the same way as are the goodwill notes, in that the prerequisite for the remedies it provides, including attorney fees, is PC Crane's default on its obligations under the notes or under the deed of trust itself:

> *Should Trustor fail to make any payment or to do any act as herein provided*, then . . . *[McQueen] may:* . . . commence, appear in and *defend any action or proceeding purporting to affect the security hereof or the rights or powers of [McQueen]* . . . ; and in exercising any such powers, incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefor, including costs of evidence of title, employ counsel, and *pay counsel's reasonable fees*.

(Emphases added.) The deed of trust includes an "Events of Default" section that seems to describe what would amount to a failure "to do any act as herein provided." Such events include failure "to pay or perform any obligation or agreement secured hereby," including the goodwill notes; failure "to perform and discharge fully and timely any obligation or agreement required in this Deed of Trust"; and Lacy, LLC's insolvency or bankruptcy.

¶20   In arguing that the district court erroneously denied an award of attorney fees contemplated by the deed of trust, McQueen focuses on the language "defend any action or proceeding purporting to affect the security hereof or the rights or powers of [McQueen]," contending that it was forced to do just that in its successful defense against PC Crane in this action. McQueen's argument, however, bypasses the provision's introductory language, which preconditions the payment of attorney fees on the "fail[ure] to make any payment or to do any act as herein provided" or, in other words, a default under either the deed of trust or the goodwill notes. McQueen does not claim that any of the identified events of default occurred. Our analysis of the attorney fees and default provisions of the goodwill notes, *see supra* ¶¶ 14-18, therefore

applies equally to the equivalent provisions of the deed of trust. For the reasons stated there, we conclude that PC Crane's suit to rescind the contracts and recover its payments plainly does not amount to an event of default that triggers the award of attorney fees under the deed of trust.[5] *See Turtle Mgmt.*, 645 P.2d at 671 (allowing attorney fees only in strict compliance with the contractual terms). Accordingly, we affirm the denial of attorney fees pursuant to the deed of trust.

### 3. The Guaranty

¶21 The guaranty ensures payment to McQueen of the second goodwill note and "any other debt or obligation of [PC Crane]." According to its terms, the Guarantors "agree[] to jointly and severally pay all reasonable attorney fees and costs *necessary for the enforcement of this Guaranty*." (Emphasis added.) McQueen argues that it expended attorney fees to enforce the guaranty when it defended against PC Crane's claim that McQueen breached the purchase agreements. The guaranty, however, does not purport to warrant the validity of the underlying obligations; rather, it only promises payment in the event that PC Crane does not pay any amounts actually owed to McQueen *pursuant to* the underlying documents: "[T]he undersigned [G]uarantors . . . guarantee to [McQueen] the prompt and full payment of *all sums now or hereinafter due pursuant to* said Notes *or otherwise due* [McQueen] by [PC Crane] *pursuant to* the Notes and any other debt or obligation of [PC Crane] . . . ." (Emphases added.) Further, these guaranty obligations are triggered only "[i]n the event of default" on PC Crane's obligations to McQueen. Consequently, in the absence of a defined default, a suit by PC Crane to have the underlying debt declared unenforceable, while it may ultimately threaten McQueen's ability to collect on the notes, does not trigger any obligation or require any action by the Guarantors. If the debt is declared legitimate, then the guaranty provides McQueen with a safeguard against nonpayment of the notes by PC Crane. On the other hand, if the debt is declared unenforceable, there is no remaining obligation "pursuant to" which the Guarantors can be held to account. We therefore conclude that the attorney fees and costs McQueen has incurred in its defense against PC Crane's breach of contract claim are not "necessary for the enforcement of th[e]

---

5. Because we agree with the district court that a condition precedent to an award of attorney fees--an event of default--did not occur, we do not consider McQueen's argument that the district court also wrongly decided that PC Crane's actions did not "affect the security [of the deed of trust] or the rights or powers of [McQueen]" as required to trigger the payout clause of the remedies provision.

Guaranty."[6] As a result, we affirm the district court's denial of McQueen's request for attorney fees under the guaranty.

B.  Statutory Fees

¶22    McQueen also requests attorney fees under the reciprocal attorney fees statute. *See* Utah Code Ann. § 78B-5-826 (2008).  Because McQueen did not request statutory fees in the district court, the issue is not preserved for appeal.  *See generally O'Dea v. Olea*, 2009 UT 46, ¶ 20, 217 P.3d 704 (stating that, in the absence of certain exceptions, an appellate court will not review an issue of which the trial court was not alerted and provided an opportunity to consider).  McQueen asserts that this court's subsequently-issued decision of *Hooban v. Unicity International, Inc.*, 2009 UT App 287, 220 P.3d 485 (mem.), *cert. granted*, 225 P.3d 880 (Utah Jan. 20, 2010) (No. 20090932), sheds new light on the statute and that we therefore ought to consider the matter even though it was not raised below.  Whether or not *Hooban* changes the way in which the statute has been viewed, however, we do not believe that the case supports McQueen's position.

¶23    Even if *Hooban*'s broad language establishes a new or different basis for McQueen to assert that it is eligible for statutory attorney fees, nothing in *Hooban*, our previous case law, or the statute itself permits a party to recover fees beyond those provided for by the contract's terms.  Indeed, the purpose of the reciprocal attorney fees statute is to eliminate "'unequal exposure to the risk of contractual liability for attorney fees.'"  *Id.* ¶ 11 n.3 (quoting *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶¶ 76-77, 201 P.3d 966); *see also Bilanzich v. Lonetti*, 2007 UT 26, ¶ 18, 160 P.3d 1041 (noting that the reciprocal attorney fees statute "was designed to create a level playing field for parties to a contractual dispute" (internal quotation marks omitted)).  The net effect of the reciprocal attorney fees statute, therefore, is to "ensure that both parties are subject to

_____

6.  In a footnote to supplemental briefing requested by this court on the issue, McQueen points out that David Belcher and Vernon Belcher were individually named as plaintiffs in the underlying action when their only relationship to the transaction is as Guarantors.  McQueen implies that the inclusion of David and Vernon Belcher as plaintiffs in this litigation therefore indicates that the guaranty was an issue in the underlying suit.  McQueen further asserts that even if the applicability of the guaranty was not raised by the pleadings, its applicability was tried by consent.  Even accepting McQueen's contentions, the guaranty (by its terms) is only implicated when enforceable obligations under the goodwill notes are not satisfied, a condition that we determine was not met in the context of this litigation.

the [contractual] attorney fee provision." *See Giusti*, 2009 UT 2, ¶ 77; *accord Bilanzich*, 2007 UT 26, ¶ 19 ("[I]n order to further the statute's purpose [of eliminating unequal risk], the exposure to the risk of a contractual obligation to pay attorney fees must give rise to a *corresponding* risk of a statutory obligation to pay fees." (emphasis added)). Accordingly, the statute affords to the party not benefitted by a contractual attorney fee provision the same access to attorney fees that the provision explicitly affords to the other party. The statute does not create an independent right to a fee award that the contract's attorney fee provision would not allow to either party simply because the fee provision is one-sided. Because we have previously decided that neither the notes nor the deed of trust provide for an award of attorney fees in the absence of a default, we decline to accept, on the same basis, McQueen's claim that it is entitled to fees under the statute, and we see nothing in *Hooban* that would change this.

## II. Sanctions

¶24 The second matter for our review is the district court's sanctions award against PC Crane in the amount of $7475. McQueen asserts that the award was insufficient because it had "expended multiple tens of thousands of dollars in legal fees" during discovery to obtain disclosure from PC Crane of a significant fact that should have been revealed much earlier and the award of $7475 compensated it for only a small fraction of its expenses. PC Crane cross-appeals, claiming that the award was not supported by a factual finding that sanctions were warranted under either rule 37 or rule 26 of the Utah Rules of Civil Procedure and that the record did not support the imposition of sanctions in any case.

## A. The Relevant Proceedings

¶25 The central tenet of McQueen's defense to PC Crane's claim that McQueen failed to provide the agreed-upon goodwill was that it did, in fact, comply with the terms of their agreement. According to PC Crane, McQueen failed to adequately pass on its customer base, an essential component of which was the continued association of Lon Stam, the crane broker who had successfully negotiated the crane-hire operations for McQueen. McQueen disagreed. Specifically, McQueen asserted not only that it had informed PC Crane of its relationship with Stam and provided PC Crane with Stam's contact information but also that PC Crane had entered into a mutually-valuable working relationship with Stam by the time PC Crane purchased the fourth crane in spring 2005. Many of McQueen's discovery requests were therefore focused on obtaining information pertinent to the contacts and working relationship between PC Crane and Stam during the relevant time period.

¶26  In November 2006 and April 2007, McQueen served PC Crane with its first and second set of interrogatories and requests for production of documents, seeking, among other things, telephone numbers for Stam and compensation agreements between PC Crane and Stam.  PC Crane responded to the request for the compensation agreements by admitting that PC Crane and Stam had worked out an arrangement but contended that their agreement was made after the execution of the last crane purchase agreement with McQueen in spring 2005.  PC Crane represented that it did not have any documentation of the agreement with Stam, despite earlier statements to the contrary by Stam, David Belcher, and Paul Belcher.  With respect to the request for Stam's telephone numbers, PC Crane refused to provide them on the basis that Stam was not a party to the case.  McQueen then filed its first motion to compel in July 2007.[7]

¶27  In the meantime, McQueen had obtained a copy of a 2006 bank financing application (the 2006 bank application), in which PC Crane represented to the bank that it had collaborated with Stam on substantial crane-related projects, including one that had produced substantially increased revenue for one of the cranes purchased from McQueen:

> In our efforts to build a strong marketing position we searched out one of the most well connected crane brokers in the region[, Lon Stam]. . . .  Lon Stam has provided a high level of credibility to our crane company. . . .
>
> One of the operational designs that we and Lon collaborated on was in the building of *a custom designed trailer* that gives us the ability to use our 300 ton hydraulic Liebherr crane as either a 300 ton crane or a 165 ton crane.  This is the primary reason for the drastic increase in the annual revenue production of this machine.  The 300 ton crane alone reached a usage rate of 73% compared to a 21%

---

7. After McQueen filed the first motion to compel, PC Crane provided McQueen with most, but not all, of Stam's telephone numbers and indicated that his mobile phone provider was AT&T, which was incorrect.  PC Crane stated at the motion hearing that Stam had informed it that his carrier was AT&T and that it did not have any records that showed otherwise.  The request for Stam's telephone numbers is not at issue here.

usage rate in 2004 resulting in a 71% increase in this crane's annual revenue generation.

. . . .

The crawler cranes are the next business endeavor that we are collaborating with Lon to undertake. The opportunity to purchase the crawlers came via Lon through a long time business associate Gordon Olsen.

(Emphasis added.) Based on the statements in the 2006 bank application, McQueen served PC Crane with a third set of interrogatories focused on the referenced trailer collaboration with Stam. The ultimate goal of these interrogatories was to determine whether the "custom designed trailer" project implicated a relationship between Stam and PC Crane during the relevant time period. Among other things, McQueen asked PC Crane to "[i]dentify (by name, address, and telephone number) each person who participated in the design or construction of the [custom designed] Trailer [referenced in the 2006 bank application] an[d], as to each, reasonably describe what he or she did concerning the Trailer." McQueen also asked PC Crane to "[s]tate the date construction of the Trailer began, the date construction of the Trailer ended, and the date upon which application was made to license the Trailer." PC Crane objected that the request was "overly broad" and "unduly burdensome" and sought "information that is not relevant and not likely to lead to admissible evidence." PC Crane then refused to provide any answer to the interrogatory. As a result, on August 10, 2007, McQueen filed a second motion to compel, which PC Crane opposed on the basis that "McQueen asks the Court to compel the disclosure of information which . . . relates to events that occurred outside of the relevant discovery [time period] in this action [of October 2004 to spring 2005]."

¶28　At a combined hearing on the two motions to compel held on September 5, 2007, McQueen produced the 2006 bank application and argued that it demonstrated that PC Crane had collaborated with Stam in spring 2005. PC Crane again denied the relevance of the referenced trailer modification, stating that it had previously "certified in a letter[ that] this collaboration occurred much after the purchase of the fourth crane in April of 2005. It was well into the year 2006." Counsel reiterated that it had no documentation during the relevant time period because the "trailer wasn't even conceived of until the year 2006 between Stam and the Belchers. . . , a year and a half after they purchased the first [three] cranes." Following argument, Judge Dever ordered that PC Crane produce "any documents prior to December of '05 relating to the design or construction of th[e] trailer [modification referenced in the 2006 bank application]." Judge Dever denied

McQueen's requests for attorney fees associated with bringing the motions. On November 1, 2007, PC Crane answered the pertinent discovery requests, stating that it "ha[d] no responsive documents."

¶29    McQueen then procured independent evidence that verified that PC Crane had modified a drop-deck trailer in spring 2005. McQueen also presented a document that it claimed demonstrated that PC Crane had completed the crawler cranes business endeavor referenced in the 2006 bank application in December 2005. Relying on PC Crane's statements in the bank application that the crawler cranes endeavor had occurred subsequent to the trailer modification collaboration, McQueen inferred that the trailer modification that occurred in spring 2005 was the one referenced in the 2006 bank application, contrary to PC Crane's assertion that this PC Crane-Stam collaboration did not occur until 2006. Accordingly, McQueen sent PC Crane a fourth set of interrogatories seeking "identif[ication of] each drop-deck trailer owned by PC Crane at any time between October 15, 2004 and December 31, 2005," and a "state[ment of] whether this trailer was or was not that certain custom designed trailer [referenced in the 2006 bank application]." PC Crane again objected that the information sought was overly broad, unduly burdensome, irrelevant, and "outside the scope of discovery authorized by the [district c]ourt" in its earlier order. As before, PC Crane declined to answer the interrogatories. On December 13, 2007, McQueen filed a third motion to compel and its first motion for sanctions. The motion to compel sought an order compelling PC Crane "to produce all documents relating to the acquisition, design, modification, licensing, or permitting of any trailer owned by PC [Crane] between October 2004 and [December 2007]." The supporting memorandum narrowed the breadth of the request, indicating that McQueen was particularly interested in the custom designed trailer referenced in the 2006 bank application, which it believed had been modified in collaboration with Stam in spring 2005 and was seeking documents showing its modification date. McQueen's motion for sanctions requested all attorney fees incurred in bringing the three motions to compel and the motion for sanctions itself.

¶30    At a hearing held on March 4, 2008, McQueen supported its third motion to compel and its first motion for sanctions with a copy it had obtained of a March 2005 loan disbursement form that showed that PC Crane had received money to repair or build a drop-deck trailer, similar to the one referenced in the 2006 bank application. PC Crane asserted, however, that the modification done in March 2005 was "for a different crane . . . for the 165[-ton] Liebherr[, not] . . . the 300" and that "Vern[on] Belcher did this one on his own." PC Crane maintained that the trailer modification collaboration referenced in the 2006 bank application did not occur in 2005:

> [T]he Court said, in its order . . . [that PC Crane is to produce a]ll documents created prior to December 2005 concerning the design, production, manufacture or construction of that certain custom designed trailer [referenced in the 2006 bank application].
>
> Your Honor, there aren't any documents. And Counsel can believe there are until the cows come home, but that won't create documents that don't exist. Did [PC Crane and Stam] collaborate? Yes, they did. What was the timing of that collaboration? I don't know. I don't agree with Counsel's assertion that because the next paragraph [of the 2006 bank application] says the next business endeavor[, the crawler cranes, which was completed in December 2005,] means that it was the next one in chronological order[.] I don't know what they meant by that. But they did collaborate and there just aren't any documents.

In a bench ruling, Judge Dever ordered PC Crane to "produce documents reflecting work done during the period of October 1, 2004 through December 31, 2005 to modify *any* drop-deck trailers owned by [PC Crane]" and permitted McQueen to redepose the Belchers for the limited purpose of inquiring about "work done between October 1, 2004 and December 31, 2005 to modify *any* drop-deck trailer owned by [PC Crane]." (Emphases added.) The judge, however, "denie[d] *at this time* [McQueen's] request for attorney fees and other sanctions." (Emphasis added.)

¶31    Three weeks after the hearing, however, on March 26, 2008, PC Crane sent McQueen a letter in which it asserted for the first time that the "trailer mentioned in [the bank] documents was never actually built."[8] In other words, PC Crane disclosed for the first time that the trailer modification that it had described in such positive terms in the 2006 bank application and whose chronological relevance had been so central to the arguments of the parties at the hearings on the motions to compel had never

---

8. It is not clear from the record whether PC Crane actually possessed and simply had never modified the trailer that it claimed, in the bank application and throughout the underlying discovery proceedings, to have modified or whether it never owned the trailer at all. For simplicity, we will refer to the trailer "modification" as never having occurred.

actually occurred, other than conceptually.  McQueen again moved for sanctions, arguing that because the trailer modification it had sought information on for months at such cost had now proved to be nonexistent all along, PC Crane had misrepresented material facts, disobeyed discovery orders, and filed baseless objections to discovery requests in violation of rule 37 and rule 26 of the Utah Rules of Civil Procedure.  Judge Dever never considered this motion; rather, it was resolved post-trial by Judge Reese after Judge Dever was disqualified on McQueen's motion.  Judge Reese granted the motion, but limited the sanctions to $7475, the amount of McQueen's attorney fees associated with bringing the second motion for sanctions.  The stated basis for the decision to grant sanctions was that PC Crane's "position . . . that the trailer [modification] had never been built[] was *inconsistent* with [its] previous position that the trailer existed [but had been modified at a later date]."  (Emphasis added.)  Judge Reese declined, however, to disturb or reconsider Judge Dever's earlier denial of McQueen's requests for fees or other sanctions, limiting the award of attorney fees to the sanctions motion itself.

B.  The Entry of Sanctions

¶32    In reviewing the imposition of sanctions under rule 37 and rule 26, this court has traditionally applied a two-part approach.[9]  First, we consider whether the district court was justified in ordering sanctions.  *See generally Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 (requiring a finding that the party's behavior warranted sanctions under rule 37); *see also* Utah R. Civ. P. 26(g) (mandating sanctions upon a determination that certification on a discovery request, response, or objection was made in violation of the rule).  We then review the type and amount of sanctions for abuse of discretion.  *See Kilpatrick*, 2008 UT 82, ¶ 23 (giving trial courts deference in imposing an appropriate sanction for a violation of rule 37); *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 35, 215 P.3d 933 (applying same standard for conducting review under rule 26).  PC Crane's arguments focus on whether the sanctions are justifiable (the first step of our analysis) while McQueen's arguments target the district court's discretion in setting the type and amount of sanctions (the second step of our analysis).

1.  The Court's Factual Findings Are Sufficient Under the Circumstances.

---

9.  Rule 37 and rule 26 of the Utah Rules of Civil Procedure have recently been amended.  *See* Utah R. Civ. P. 37 advisory comm. notes; *id.* R. 26 advisory comm. notes.  These amendments, however, only affect cases filed on or after November 1, 2011, and we therefore rely on the rules as they were preamendment.

¶33    Rule 37(b)(2) provides for the entry of sanctions if "a party fails to obey an order entered under [Utah] Rule [of Civil Procedure] 16(b) or if a party . . . fails to obey an order to provide or permit discovery . . . , unless the court finds that the failure was substantially justified," Utah R. Civ. P. 37(b)(2), while rule 37(d) permits sanctions if a party fails to respond to interrogatories or requests for inspection of documents, *see id.* R. 37(d); *see also Depew v. Sullivan*, 2003 UT App 152, ¶ 35, 71 P.3d 601 (requiring sanctions for a violation of rule 37(d) "'unless the court finds that the [discovery violation] was substantially justified or that other circumstances make [a sanction] unjust'" (first alteration in original) (quoting Utah R. Civ. P. 34(d))).  Under rule 26(g), "[e]very . . . response or objection [to discovery requests] shall be signed by at least one attorney of record."  Utah R. Civ. P. 26(g).  The signature "constitutes a certification that the person has read the request, response, or objection and that to the best of the person's knowledge, information, and belief formed after reasonable inquiry," the response or objection was not made "for any improper purpose," was made "consistent with the[] rules" of procedure and existing law, and was not intended to create an undue burden or expense.  *Id.*

> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification . . . an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

*Id.*

¶34    "Sanctions are warranted [under rule 37] when (1) the party's behavior was willful; (2) the party has acted in bad faith; (3) the court can attribute some fault to the party; or (4) the party has engaged in persistent dilatory tactics tending to frustrate the judicial process."  *Kilpatrick*, 2008 UT 82, ¶ 25 (internal quotation marks omitted).  The parties have not provided, nor have we located, any Utah case law that expressly requires a finding of fault or willfulness to support a conclusion that rule 26 has been violated.  The Utah Supreme Court, however, in the context of the failure to make disclosures as required by rule 26(a), has stated that sanctions are not mandatory when there is "good cause for the failure to disclose."  *See Bodell Constr. Co.*, 2009 UT 52, ¶ 35.  The reference to a good cause exception to the otherwise mandatory imposition of sanctions under rule 26 therefore implies that the rule does encompass an element of fault, whether it amounts to willfulness or mere neglect.  *See generally* Fed. R. Civ. P. 26(g)(3) (providing, under a substantially similar rule, that sanctions are mandatory for

a certification made in violation of the rule unless there was "substantial justification" for the violation). At the very minimum, rule 26(g) requires *reasonable* inquiry before certification that its obligations have been satisfied. *See* Utah R. Civ. P. 26(g). Moreover, the "willfulness standard [as it is used in rule 37] is low" and includes "'any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown.'" *Welsh v. Hospital Corp. of Utah*, 2010 UT App 171, ¶¶ 9, 12, 235 P.3d 791 (quoting *Utah Dep't of Transp. v. Osguthorpe*, 892 P.2d 4, 8 (Utah 1995)). Thus, although couched in different terms, rule 37 and rule 26 both are aimed at encouraging good faith compliance with the discovery obligations imposed under the rules of civil procedure and both provide the court with the authority to sanction those who fail to live up to the requirements of those rules. As discussed in the next section, *see infra* ¶¶ 37-40, PC Crane failed to live up to them in this case.

¶35    We now address PC Crane's claim that sanctions were not warranted because the district court failed to make "a factual finding that [its] behavior merits sanctions," *see Kilpatrick*, 2008 UT 82, ¶ 23. Contrary to PC Crane's contention, the district court did make such a finding: "The Court finds that [PC Crane]'s position [following the third motion to compel and the first motion for sanctions hearing] that the trailer [modification] had never been built[] was inconsistent with [its] previous position that the trailer had existed" and ordered sanctions "[b]ased upon the inconsistency of [PC Crane]'s position." According to PC Crane, however, the court's finding of "inconsistency" indicates that it accepted PC Crane's explanation that its change in position regarding the modified trailer resulted from an innocent miscommunication, rather than from any willfulness or bad faith. PC Crane thus asserts that "th[e] finding . . . is legally insufficient to support an award of sanctions." The argument is unpersuasive. Although the word "inconsistent" in isolation might be susceptible to PC Crane's interpretation, Judge Reese's subsequent action--the imposition of a not insignificant sanction of $7475--clearly demonstrated that he did not accept PC Crane's explanation. Rather, it appears Judge Reese used "inconsistent" as a restrained manner of describing behavior that he found to be sanctionable under the criteria of rule 37 and rule 26.

¶36    Furthermore, while PC Crane correctly observes that the district court "must find on the part of the noncomplying party willfulness, bad faith, . . . fault, or persistent dilatory tactics frustrating the judicial process," prior to entering sanctions, *Morton v. Continental Baking Co.*, 938 P.2d 271, 274 (Utah 1997) (citations and internal quotation marks omitted), "a trial court need not specifically state that willfulness, bad faith, fault, or persistent dilatory tactics are present to impose sanctions," *Welsh*, 2010 UT App 171, ¶ 12. "We will affirm so long as 'the findings appear in the lower court's opinion or

elsewhere to sufficiently indicate the factual basis for the ultimate conclusion'" or where there is evidence in the record to support the award. *Id.* (quoting *Preston & Chambers, PC v. Koller*, 943 P.2d 260, 263 (Utah Ct. App. 1997)); *see also Koller*, 943 P.2d at 262-63 (affirming the entry of rule 37 sanctions in the absence of a willfulness finding where evidence in the record supported the award). The necessary findings are adequately discernible from this record.

2. There Is Sufficient Evidence To Warrant the Imposition of Sanctions.

¶37 It is apparent that by September 5, 2007, when the hearing on the second motion to compel was held, PC Crane was aware that McQueen was seeking specific information regarding the date or time frame of PC Crane's collaboration with Stam on the custom designed trailer that PC Crane described in the 2006 bank application. To each of McQueen's discovery requests, however, PC Crane had objected on the basis that the requests were "overly broad, unduly burdensome, . . . not relevant, and not likely to lead to admissible evidence." The bases for such objections were that PC Crane owned eight to ten trailers at the time and that the one about which McQueen was seeking information was outside the relevant time period of October 2004 to December 2005. But each of these responses reasonably implied that the subject matter of the motions to compel--the custom designed trailer--was extant and thus encouraged McQueen to pursue information about the trailer through additional discovery and further judicial recourse that would have been entirely unnecessary if the truth about the subject trailer had been revealed early in the process. McQueen's requests and the nature of PC Crane's objections and responses imposed upon PC Crane an obligation to reasonably inquire into the essential circumstances surrounding its collaboration with Stam, at least to an extent that would have revealed the very basic information that the trailer modification PC Crane had touted to the bank had never actually occurred at all. Certainly PC Crane could not have been in a position to argue in good faith to the court that the information McQueen sought about the modified trailer in its various motions to compel was outside the time frame relevant to the litigation without first having made the kind of minimal inquiry that would have revealed that the trailer in question was not, in fact, ever modified. And, at that point, a reasonable person acting within minimal standards of good faith would have disclosed that critical information to McQueen and the court.

¶38 PC Crane has offered no justifiable explanation for having proceeded for many months, through the course of multiple written objections and several hearings, in a manner that necessarily acknowledged the existence of a modified trailer, when the trailer modification simply never occurred. At the hearing before Judge Reese on

March 31, 2009, PC Crane's counsel admitted that he failed to promptly provide this information:

> If I made one mistake it was in [not] earlier asking my client more questions about the [custom designed] 300-ton trailer [referenced in the 2006 bank application].
>
> What happen[ed], your Honor, let me explain . . . . I get a request for information relating to the this [2006 bank application], and I get a request for all documents relating to this trailer, the 300-ton trailer, and I e-mail that--I scanned it and emailed it over to my client and say I want all the documents referenced in this and then I follow up with them. My client told me I have no documents relating to this trailer.
>
> I did not and I admit today that it is my fault for not asking the question, was that trailer ever built?

¶39     Although PC Crane attributes the late disclosure to an innocent miscommunication between it and its counsel, PC Crane's actions are difficult to characterize as other than the result of either an inexplicable failure to make the basic sort of inquiry called for by the circumstances or a disingenuous nondisclosure. In other words, a reasonable person acting under a minimal obligation of good faith and candor, as litigants must act in such circumstances, would have realized that this information was significant to McQueen's decision about how it should next proceed, either in discovery or in moving forward toward trial, and would have inquired about the subject trailer modification, which inquiry likely would have led to the discovery that the trailer modification, identified and emphasized in PC Crane's 2006 bank application, never actually occurred. Certainly, once a motion to compel was filed and the focus of inquiry identified, not to mention in the course of an additional motion to compel, letters, memoranda, and hearings over a period of months, the nonexistence of the subject matter would naturally appear pertinent. Regardless of whether the failure to disclose was purposeful or negligent, however, PC Crane's conduct was unjustified, i.e., lacking the good cause sufficient to avoid sanctions under rule 26 and meeting at least the minimal standard of some fault under rule 37. Furthermore, that conduct imposed upon McQueen thousands of dollars in avoidable discovery expenses. On this evidence, discovery sanctions are appropriate.

20090791-CA                                    22

¶40 Implicit in some of PC Crane's arguments is an assertion that despite its failure to inquire, PC Crane could not be found in violation of rule 37 because it complied with all of the district court's discovery orders and responded to all requests from McQueen. *See generally* Utah R. Civ. P. 37(b)(2), (d) (detailing actions during discovery warranting sanctions). Our discovery rules must be read to require something more than the merest technical compliance, however. As explained above, the standards for sanctions under both rule 37 and rule 26 certainly imply that compliance with discovery obligations implicates some minimal level of reasonableness and good faith, a standard sufficient to further the laudable purpose stated in rule 1 of our rules of civil procedure "to secure the just, speedy, and inexpensive determination of every action," Utah R. Civ. P. 1. The purpose of rule 1 would be defeated in discovery if mere technical compliance, however misleading, were always sufficient to avoid discovery sanctions.

C. Judge Reese Properly Awarded McQueen Its Attorney Fees for the Second Motion for Sanctions but Should Have Reconsidered Judge Dever's Previous Rulings on Sanctions in Light of the New Facts.

¶41 Having determined that sanctions were appropriate, we now consider McQueen's argument that the amount of the award was too low and amounted to an abuse of discretion. *See generally Utah Dep't of Transp. v. Osguthorpe*, 892 P.2d 4, 8 (Utah 1995). "[T]o show the trial court abused its discretion in choosing which sanction to impose, [a party] must show either that the sanction is based on an erroneous conclusion of law or that the sanction lacks an evidentiary basis." *SFR, Inc. v. Comtrol, Inc.*, 2008 UT App 31, ¶ 14, 177 P.3d 629 (internal quotation marks omitted).

¶42 With respect to the court's award of attorney fees on the second motion for sanctions, we affirm. Judge Reese awarded the full amount of fees incurred in bringing the second motion for sanctions, that is, the "attorney fees, caused by the failure" of PC Crane to provide McQueen with straightforward information regarding the trailer modification referenced in the 2006 bank application. *See* Utah R. Civ. P. 37(b)(2), (d).[10] Because McQueen incurred the fees in the course of obtaining a significant admission

---

10. Though McQueen does not reference rule 26 for this proposition, rule 26(g) contains similar language. *See generally* Utah R. Civ. P. 26(g) ("If a certification is made in violation of the rule, the court . . . shall impose . . . an appropriate sanction, which may include an order to pay *the amount of the reasonable expenses incurred because of the violation*, including a reasonable attorney fee." (emphasis added)).

from PC Crane, which was pertinent to the substance of McQueen's defense and should have been revealed much earlier in the discovery process, a sanction of attorney fees is an appropriate use of the district court's discretion and we do not disturb it.

¶43    We remand, however, for the district court to reconsider its decision not to revisit Judge Dever's earlier denial of sanctions in light of PC Crane's subsequent admission that the relevant trailer was never modified.  We recognize that "under the law of the case doctrine, a decision made on an issue during one stage of the case is binding in successive stages of the same litigation." *See Mid-America Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶ 12, 216 P.3d 352 (internal quotation marks omitted).  This doctrine, however, applies only to the parties of the case.  The district court is ordinarily "free to reconsider that decision," either "sua sponte or at the suggestion of one of the parties." *See id.* (indicating that "the doctrine of law of the case tracks with . . . Utah Rule[] of Civil Procedure" 54(b), which allows a court to revise its decision any time prior to the entry of a judgment "'adjudicating all the claims and the rights and liabilities of all the parties'" (quoting Utah R. Civ. P. 54(b))).  This is true even when a second judge has taken over the case because "the two judges, while different persons, constitute a single judicial office." *Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶ 14, 233 P.3d 538 (internal quotation marks omitted), *cert. granted*, 238 P.3d 443 (Utah Aug. 26, 2010) (No. 20100449); *see also Macris v. Sculptured Software, Inc.*, 2001 UT 43, ¶ 30, 24 P.3d 984 (concluding that the law of the case doctrine did not preclude a successor judge from reversing the first judge's grant of partial summary judgment because the successor judge was "the same judicial officer reconsidering a prior [nonfinal] ruling under rule 54(b)").  Certain exceptions, however, "function only to dictate when the district court has no discretion but rather *must* reconsider a previously decided, unappealed issue." *See Mid-America*, 2009 UT 43, ¶ 14.  One of those exceptions is when new evidence has been presented.[11] *See id.*

¶44    When Judge Dever considered whether to award sanctions in connection with McQueen's earlier motions to compel, he was unaware that the trailer modification at issue had never occurred, as PC Crane later admitted.  PC Crane's admission is the kind of evidence that casts those previous discovery disputes--and PC Crane's related conduct--in a revealing new light that requires reconsideration of the prior decision to

---

11.  The exceptions that require reconsideration of "a previously decided, unappealed issue" are "(1) when there has been an intervening change of authority; (2) when new evidence has become available; or (3) when the court is convinced that its prior decision was clearly erroneous and would work a manifest injustice." *Mid-America Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶ 14, 216 P.3d 352 (internal quotation marks omitted).  The new evidence exception is the most applicable to the circumstances presented here.

deny sanctions for discovery abuse. *See generally id.* (requiring a court to reconsider a previously decided issue when there is new evidence); *Sittner v. Big Horn Tar Sands & Oil, Inc.*, 692 P.2d 735, 736 (Utah 1984) (stating that evidence presented in a new light is an exception to the general rule that second judges are bound by the rulings of a previous judge). Although it is clear that Judge Reese deemed Judge Dever's previous decision appropriate given the facts known to Judge Dever at that time he entered it, it is not apparent that Judge Reese reconsidered that decision in light of PC Crane's March 2008 admission that the trailer had never been modified. That admission cast new light on a course of discovery proceedings that, up to the point when Judge Dever made his ruling, appeared to have been the product of rigid adherence to the technicalities of discovery requests and orders by "seemingly equally contentious parties, all of which did not appear to be living up to their discovery obligations." The new evidence must, at least, call that conclusion into question in a way that merits further consideration of the matter in light of all the circumstances, not just those apparent at the time Judge Dever ruled.

¶45 Consequently, we remand to the district court for reconsideration of whether sanctions are warranted in addition to the $7475 McQueen incurred in connection with the second motion for sanctions. In undertaking this analysis, the district court must take into account all the circumstances of PC Crane's conduct in view of its subsequent admission that the trailer modification never occurred. We decline McQueen's invitation to undertake that task ourselves; the award or denial of sanctions in connection with discovery disputes is peculiarly within the discretion of trial courts because they are best equipped to carry out that kind of responsibility. *See Schoney v. Memorial Estates, Inc.*, 790 P.2d 584, 585 (Utah Ct. App. 1990) ("Management of the actions pending before it is uniquely the business of the trial court and while an appellate court may, of course, intervene if discretion is abused, we accord trial courts considerable latitude in this regard and considerable deference to their determinations concerning discovery."); *see also Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1320 (10th Cir. 2011) ("Discovery disputes are, for better or worse, the daily bread of magistrate and district judges in the age of the disappearing trial. Our district court colleagues live and breathe these problems; they have a strong situation sense about what is and isn't acceptable conduct; by contrast, we encounter these issues rarely and then only from a distance."); *Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 35, 215 P.3d 933 ("[T]he district court judge is in the best position to evaluate the status of his [or her] cases, as well as the attitudes, motives, and credibility of the parties." (internal quotation marks omitted)).

III.  Costs

¶46 The final issue for our resolution is whether the district court abused its discretion in awarding McQueen $1771.65 as costs for expenses incurred in conducting depositions. To recover costs, a party must persuade the trial court that the depositions "were taken in good faith and, in the light of the circumstances, appeared to be essential for the development and presentation of the case." *Young v. State*, 2000 UT 91, ¶ 6, 16 P.3d 549 (internal quotation marks omitted). If the court is persuaded, it must make a finding that explains "how the depositions were essential," that is, whether they were "used in a meaningful way at trial" or "the development of the case was of such a complex nature that the information in the depositions could not be obtained through less expensive means of discovery." *Id.* ¶ 11. PC Crane asserts this standard was not met because the information obtained from these depositions could have been gathered through less expensive means and because the depositions were not "used in some meaningful way at trial" and were not otherwise necessary for the development of the case. Although PC Crane frames this as an insufficiency-of-the-evidence argument, it necessarily encompasses a challenge to the district court's failure to make the requisite finding.

¶47 PC Crane has not shown, however, that it raised the absence of the required finding to the district court, and it therefore has waived the issue for appeal. *See* Utah R. App. P. 24(a)(5)(A) (requiring the appellant to identify the place in the record where the issue was preserved); *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue. This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." (alterations in original) (citations and internal quotation marks omitted)); *see also In re K.F.*, 2009 UT 4, ¶ 62, 201 P.3d 985 (requiring a party to object to the adequacy of the findings in the trial court to preserve the issue for appeal). This preservation rule ensures that the district court "has the opportunity" "to address and correct . . . the level of detail in [its] findings" while it was still "easy . . . to correct." *K.F.*, 2009 UT 4, ¶¶ 62-63 ("Judicial economy would be disserved if we permitted a challenge to the adequacy of the detail in the findings to be heard for the first time on appeal."). Because we do not have any findings on which we may review the district court's decision, we cannot address PC Crane's argument that the deposition costs were not essential to the development of the case.


CONCLUSION

¶48 The district court did not err in denying attorney fees under the goodwill notes and the deed of trust because no event of default had occurred to trigger entitlement to attorney fees under any of the contracts. We also affirm the denial of fees under the guaranty because the guaranty's attorney fee provision was not triggered by this litigation. The award of sanctions on the second motion for sanctions was appropriate, but we remand for Judge Reese to reconsider Judge Dever's previous denial of sanctions in light of PC Crane's subsequent disclosure that the trailer modification had never occurred. With respect to the deposition costs, the issue has not been preserved for appeal and we therefore affirm.

_____
Stephen L. Roth, Judge

-----

¶49 WE CONCUR:

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

_____
William A. Thorne Jr., Judge